# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  **CV 17-00786 SJO (GJSx)**          **DATE:** **August 21, 2017**

**TITLE:**          **H.M. et al. v. United States of America et al.**

========================================================================

**PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                                    Not Present
Courtroom Clerk                                   Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**          **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                        Not Present

========================================================================

**PROCEEDINGS (in chambers): ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER FRCP 23** [Docket No. 59]; **GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO SEVER AND DISMISS PLAINTIFFS' MANDAMUS CLAIMS AND TO DISMISS THE REMAINING CLAIMS IN PLAINTIFFS' SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND FOR WRIT OF MANDAMUS** [Docket No. 85]

These matters are before the Court on (1) Plaintiffs H.M., Najla Mohammed Hamid, Mohamed Saleh Eraga, Saba Mohamed Saeed, Karim Hafiz Hassan Alammari, and Hafiz Hassan Mohammed Alammari's (together, "Plaintiffs") Motion for Class Certification Under FRCP 23 ("Certification Motion"), filed February 21, 2017; and (2) Defendants the United States of America, United States Department of Homeland Security, United States Citizenship and Immigration Services, United States Department of State, U.S. Customs and Border Protection, Donald J. Trump, Rex Tillerson, Jefferson B. Sessions III, John Kelly, James McCament, and Kevin K. McAleenan's (together, "Defendants") Motion to Sever and Dismiss Plaintiffs' Mandamus Claims and to Dismiss the Remaining Claims in Plaintiffs' Second Amended Complaint for Injunctive Relief and Petition For Writ of Mandamus ("Dismissal Motion"), filed June 30, 2017.  Defendants opposed the Certification Motion ("Certification Opposition") on June 6, 2017, and Plaintiffs replied ("Certification Reply") on July 21, 2017.[1]  Plaintiffs opposed the Dismissal Motion ("Dismissal Opposition") on July 17, 2017, and Defendants replied ("Dismissal Reply") on July 24, 2017.  The Court found these matters suitable for disposition without oral argument and vacated the hearings scheduled for August 7, 2017.  *See* Fed. R. Civ. P. 78(b).  For the following reasons, the Court **DENIES** Plaintiffs' Certification Motion and **GRANTS IN PART** and **DENIES IN PART** Defendants' Dismissal Motion.

///
///

---

[1]  The parties' opposition and reply briefs responding to the Certification Motion were filed in accordance with three of the Court's minute orders.  (*See* ECF Nos. 65, 83, 94.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   CV 17-00786 SJO (GJSx)           DATE: <u>August 21, 2017</u>

I.      <u>FACTUAL AND PROCEDURAL HISTORY</u>

       A.      <u>Overview of the First Executive Order</u>

This case is one of several filed in the wake of President Donald J. Trump's signing of Executive Order 13,769, titled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO-1"), 82 Fed. Reg. 8977 (Jan. 27, 2017).  Referencing the past and present failings of the visa-issuance process, EO-1 had the stated purpose of "protect[ing] the American people from terrorist attacks by foreign nationals" by ensuring that the United States would not admit foreign nationals who "bear hostile attitudes" toward our nation and our Constitution, who would "place violent ideologies over American law," or who "engage in acts of bigotry or hatred," such as "'honor' killings.  *See* EO-1, Preamble, § 1.

Toward this end, the President invoked his authority under 8 U.S.C. § 1182(f) and immediately suspended for ninety (90) days the immigrant and nonimmigrant entry of foreign aliens from the following seven predominantly Muslim countries:  Iraq, Iran, Libya, Somalia, Sudan, Syria, and, most important for the purpose of this lawsuit, Yemen.  *Id.* § 3.  During this ninety-day period, the Secretary of Homeland Security, Secretary of State, and Director of National Intelligence were to "immediately conduct a review to determine the information needed from any country" to assess whether individuals seeking entry from those countries posed a national security threat.  *See id.* § 3(a)-(b).  EO-1 also placed certain constraints on the admission of refugees into the country, none of which are relevant to this case.  *See id.* § 5.

       B.      <u>Plaintiffs' Initial Complaint and Motion for a TRO and Preliminary Injunction</u>

Four days after the President signed EO-1, Plaintiffs filed both a Complaint for Injunctive Relief and Petition for Writ of Mandamus ("Complaint") and an Emergency Motion for Temporary Restraining Order and/or Preliminary Injunctive Relief ("Motion to Enjoin"), challenging EO-1 and seeking to enjoin its enforcement.  (*See generally* Compl., ECF No. 1; Prelim. Inj. Mot., ECF No. 3.)  Twenty-eight individuals were named as plaintiffs in the Complaint, each of whom allegedly either (1) was a United States citizen and resident of the United States, defined as "Plaintiff 1s;" or (2) was a citizen of Yemen and was either the child or spouse of one or more Plaintiff 1s and who held a valid Yemeni passport to the United States at the time the President signed EO-1, defined as "Plaintiff 2s."  (*See* Compl. ¶¶ 5-6.)  The Complaint asserted eleven causes of action against Defendants in connection the issuance and enforcement of EO-1, alleging EO-1 violates (1) Plaintiffs' Fifth Amendment procedural and substantive due process rights; (2) the Equal Protection Clause of the Fourteenth Amendment; (3) the Establishment Clause of the First Amendment; (4) the Emoluments Clause; (5) the Immigration and Nationality Act, 8 U.S.C. § 1152(a)(1)(A); and (6) the Administrative Procedure Act, 5 U.S.C. Sections 555 and 701 *et seq.* (*See generally* Compl.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**  <u>CV 17-00786 SJO (GJSx)</u>        **DATE:** <u>August 21, 2017</u>

The same day Plaintiffs filed these pleadings, Judge Andre Birotte, to whom the case was initially assigned, granted Plaintiffs' request for a TRO, (1) temporarily enjoining and restraining Defendants from enforcing EO-1 and from "cancelling validly obtained and issued immigrant visas of Plaintiffs;" and (2) ordering Defendants to return to Plaintiffs their passports containing validly issued visas so that they could travel to the United States on said visas.  (Order Granting Mot. to Enjoin, ECF No. 7.)  The instant action was transferred to this Court on February 2, 2017 pursuant to General Order 16-05 in light of its relation to *Vayeghan v. Kelly et al.*, No. 17-cv-00702 (C.D. Cal.), an earlier-filed case challenging EO-1 in which a TRO was issued by Judge Dolly Gee.  (*See* Order re Transfer Pursuant to General Order 16-05, ECF No. 21.)   Plaintiffs filed a supplement to their Motion to Enjoin on February 2, 2017.  (Suppl. to Mot. to Enjoin, ECF No. 22.)  Defendants opposed the motion on February 5, 2017, and Plaintiffs replied on February 8, 2017.  (*See* Opp'n to Mot. to Enjoin, ECF No. 26; Reply in Supp. Mot. to Enjoin, ECF No. 45.)

C.  <u>The Ninth Circuit Affirms a Nationwide Injunction of the First Executive Order, and District Courts Respond</u>

As noted above, this case does not exist in a vacuum.  Shortly after the ink was dry, individuals, organizations, and states across the nation challenged EO-1 in federal court.  For example, on February 3, 2017, a judge in the Western District of Washington granted a TRO, enjoining enforcement nationwide of Sections 3(c), 5(a)-(c), and 5(e).  *See Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017).  The Ninth Circuit subsequently denied the Government's request to stay the TRO pending appeal and declined to "rewrite" EO-1 by narrowing the TRO's scope, noting that the "political branches are far better equipped" for that task.  *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) (per curiam).

The day after the Ninth Circuit affirmed the nationwide injunction of EO-1, this Court held a hearing regarding the impact of Ninth Circuit's opinion on this case and on two related cases.  (*See* Minutes of Feb. 10, 2017 OSC, ECF No. 54.)  In light of the parties' submission that they had been working to reach a stipulation to dismiss, the Court set a status conference for February 14, 2017.  (*See* Minutes of OSC Hr'g re Mot. to Enjoin, ECF No. 54; Reporter's Tr. of Feb. 10, 2017 Proceedings, ECF No. 55.)  On February 13, 2017, the Court granted the parties' joint stipulation to continue the hearing on the Motion to Enjoin from February 14, 2017 to February 21, 2017.  (*See* Order Approving Joint Stip. to Continue Hr'g Date on Mot. to Enjoin, ECF No. 52.)

D.  <u>Plaintiffs' FAC, Motion for Class Certification, and Subsequent Events</u>

On the morning of the February 21, 2017 status conference hearing, Plaintiffs filed both their First Amended Complaint for Injunctive Relief and Petition for Writ of Mandamus ("FAC") and the instant Motion.  (*See* FAC, ECF No. 58; Certification Mot., ECF No. 59.)  Although the FAC pared down the list of plaintiffs listed in the caption from twenty-eight to six, identifying H.M., Najla Mohammed Hamid, Mohamed Saleh Eraga, Saba Mohamed Saeed, Karim Hafiz Hassan

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  CV 17-00786 SJO (GJSx)        DATE: **August 21, 2017**

Alammari, and Hafiz Hassan Mohammed Alammari as Plaintiff 1s and 2s, attached as Exhibit A to the Declaration of Julie A. Goldberg submitted in support of the Certification Motion ("Goldberg Certification Declaration") is a list of **564** individuals that the FAC alleges are "similarly situated" Plaintiff 1s and 2s (the "List"). (*See* FAC ¶ 8; Goldberg Certification Decl., Ex. A ("List"), ECF No. 59-2.)  Moreover, in light of events that had transpired over the course of the previous few weeks, the focus of the FAC shifted from a theory that Defendants improperly "cancelled" immigrant visas that had already "issued" to Yemeni Plaintiff 2s at the time EO-1 was signed, (*see* Compl. ¶¶ 5-7), to allegations that because of EO-1, immigrant visa applications that had been "approved" and "sent to the [State Department] for final processing" were derailed, (*see* FAC at 2-4).  In particular, the FAC alleges that the final approval process was "unreasonably hampered, halted and/or otherwise interrupted," resulting in Defendants (1) "halting final processing of pending visa[s;]" (2) "canceling already scheduled visa-related interviews[;] and/or (3) "failing or refusing to schedule interviews of Beneficiary relatives of [U.S. citizen]/LPR Plaintiff Petitioners," at least for "certain named and class Plaintiff 2s."  (FAC at 2-4.)  The FAC asserted causes of action under (1) the Due Process Clause of the Fifth Amendment; (2) the Equal Protection Clause of the Fourteenth Amendment; (3) the Establishment Clause of the First Amendment; (4) the Emoluments Clause; (5) the Administrative Procedures Act; and (6) the Immigration and Nationality Act. (*See generally* FAC.)

During the status conference, the Court heard argument from counsel regarding Plaintiffs' filing of the FAC and the Motion, as well as the parties' views concerning whether the January 31, 2017 TRO should be extended, modified, dissolved, or converted into a preliminary injunction. (*See* Minutes of Feb. 21, 2017 Status Conference, ECF No. 61.)  This Court found that Plaintiffs had not demonstrated good cause for extending the TRO or converting the TRO into a preliminary injunction in light of the nationwide TRO issued in *Washington v. Trump et al.* and Plaintiffs' counsel's inability to identify any named plaintiffs with validly issued immigrant visas who were currently being denied the ability to immigrate to the United States.  (*See* Minutes of Feb. 21, 2017 Status Conference.)  Six days later, Defendants filed an *ex parte* application to continue their deadlines to respond to the FAC and the hearing date on the instant Motion. (*Ex Parte* Appl. to Continue Time to Respond to FAC & Hr'g on Certification Mot., ECF No. 64.)  The Court granted Defendants' request, ordering a response on or before May 7, 2017 and continuing the hearing on the Certification Motion from March 27, 2017 to June 27, 2017. (Order Extending Time to Respond to FAC & Hr'g on Certification Mot., ECF No. 65.)

///
///
///
///
///
///
///

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **CV 17-00786 SJO (GJSx)**          **DATE: August 21, 2017**

E.      The President Signs the Second Executive Order

The President enacted a second executive order ("EO-2") on March 6, 2017.  *See* Exec. Order No. 13780, "Protecting the Nation from Foreign Terrorist Entry Into the United States," 82 Fed. Reg. 13209 (Mar. 6, 2017).  By its terms, EO-2 revoked and replaced EO-1.  *Id.* § 1(i).  Moreover, like EO-1, EO-2 places certain restrictions on the admission of refugees into the country, none of which are relevant to this case.  *Id.* § 6.

Section 2(c) of EO-2 reinstated the ninety-day suspension of entry for nationals from six countries, eliminating Iraq from the list, but retaining Iran, Libya, Somalia, Sudan, Syria, and Yemen (the "Designated Countries").  *Id.* § 2(c).  The President, again invoking 8 U.S.C. § 1182(f) and also citing 8 U.S.C. § 1185(a), declared that the "unrestricted entry" of nationals from these countries "would be detrimental to the interests of the United States."  *Id.*

EO-2, unlike its predecessor, states that nationals from the Designated Countries warrant "additional scrutiny" because "the conditions in these countries present heightened threats[;]" for example because "[e]ach of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones."  *Id.* § 1(d).  EO-2 states that "until the assessment of current screening and vetting procedures required by section 2 of this order is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high."  *Id.* § 1(f).  EO-2 provides brief descriptions of the conditions in each of the Designated Countries and notes that "[s]ince 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States."  *Id.* § 1(h).  EO-2 gives examples of two Iraqi refugees who were convicted of terrorism-related offenses in January 2013 and a naturalized citizen who came to the United States as a child refugee from Somalia who was sentenced for terrorism-related offenses in October 2014.  See *id.* § 1(h).

EO-2 also clarifies that the suspension of entry applies to foreign nationals who (1) are outside the United States on its effective date of March 16, 2017; (2) do not have a valid visa on that date; and (3) did not have a valid visa on the effective date of EO-1—January 27, 2017.  *Id.* § 3(a).  Importantly, Section 2(c) does not bar entry of lawful permanent residents ("LPRs"), dual citizens traveling under a passport issued by a non-banned country, asylees, or refugees already admitted to the United States.  *Id.* § 3(b).  EO-2 also includes a provision that permits consular officers, in their discretion, to issue waivers on a case-by-case basis to individuals barred from entering the United States.  *Id.* § 3(c).

///
///
///
///

MINUTES FORM 11
CIVIL GEN                          Page 5 of 49                     Initials of Preparer _____

__ : __

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   CV 17-00786 SJO (GJSx)          DATE: **August 21, 2017**

F.      Plaintiffs File their SAC

Defendants notified the Court of the signing of EO-2 and the parties thereafter filed a Stipulation Regarding Amending Complaint and Deadlines, asking the Court to permit Plaintiffs to file a Second Amended Complaint ("SAC") and to permit Defendants to respond to the SAC on or before June 29, 2017.  (*See* Notice re EO-2, ECF No. 70; Stip. for Order re: SAC, ECF No. 71.) The Court approved this stipulation, and Plaintiffs filed their SAC on May 16, 2017, in which they allege the following.  (Order Approving Stip. for Order re: SAC, ECF No. 73; SAC, ECF No. 74.)

Like Plaintiffs' earlier pleadings, the SAC defines "Plaintiff 1s" as United States citizens or Legal Permanent Residents ("LPRs") of the United States that reside in the United States and defines "Plaintiff 2s" as citizens of the country of Yemen who hold valid Yemeni passports and who are relatives of Plaintiff 1s.  (SAC at 2.)  All Plaintiff 1s filed Form I-130 "Petitions for Alien Relative" ("Form I-130 Petitions") with the United States Citizenship and Immigration Services ("USCIS") for Plaintiff 2s and all such Petitions were "approved" by USCIS and were subsequently sent to the U.S. Department of State for "final processing."  (*See* SAC at 2.)  Plaintiff 1s were motivated to secure immigrant visas for Plaintiff 2s "based on the unlivable conditions and carnage transpiring in Yemen as a result of the Yemeni civil war."  (SAC at 2.)  Plaintiff 1s have paid filing fees and additional Nation Visa Center ("NVC") processing fees in connection with the Petition approval process.  (SAC at 2.)

In approving Plaintiff 1s' Petitions, the United States (1) "has determined that named and class Plaintiff 1s do not pose a security threat to the United States;" (2) "has determined or is now determining that named and class Plaintiff 2s do not pose a security threat to the United States;" or (3) "has failed to make a determination as to whether named and class Plaintiff 2s pose a security threat to the United States."  (SAC at 3.)  Accordingly, the Department of State "has issued to **some** named and class Plaintiff 2s valid [immigrant visas] to enter the United States. (SAC at 3.)  It has also, however, in the wake of EO-1 and EO-2, (1) refused to issue immigrant visas to certain named and class Plaintiff 2s and is holding their passports in the U.S. Embassy in the country of Djibouti; (2) cancelled Plaintiff 2s' final interview; (3) refused to schedule Plaintiff 2s' final interviews on their immigrant visa applications; and/or (4) improperly and unjustifiably placed Plaintiffs' immigrant visa applications in "administrative processing."  (SAC at 3.)

Plaintiffs allege "internal [Department of State] memoranda and/or diplomatic cables disseminated by Defendant Secretary of State [Rex Tillerson] have directed Defendants, and [the Department of State] in particular, to continue to implement" EO-2 notwithstanding the nationwide injunctions against it.  (SAC at 4.)  One or more cables instructs the Department of State "to effectively place all of Plaintiffs' immigrant visa applications in '**administrative processing**' and to group them into 'post applicant populations warranting increased scrutiny,'" which is "tantamount to Defendants' enforcement of Section 2 of [EO-2.]"  (SAC at 4 [emphasis added].)  Defendants' failure to (1) "reschedule or schedule Plaintiff 2s for interviews—**even after** nationwide injunctions issued

| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

CASE NO.:   CV 17-00786 SJO (GJSx)          DATE: <u>August 21, 2017</u>

against enforcement of the relevant provisions of" EO-2; or (2) "fully process Plaintiff 2s' immigrant visa applications and instead place them in 'administrative processing,' amounts to inaction that persists notwithstanding the fact that relevant Plaintiff 2s are in full compliance to date with Defendants' policies, practices, procedures, vetting, security background checks, and all other requirements and expectations placed on them by and through the petitioning process." (SAC at 4-5.)

Plaintiffs assert that the promulgation of both EO-1 and EO-2 and Defendants' continued enforcement of EO-2 are unlawful as applied to them, as they violate Plaintiffs' (1) due process rights under the Due Process Clause of the Fifth Amendment; (2) rights under the Equal Protection Clause of the Fourteenth Amendment, as incorporated through the Due Process Clause of the Fifth Amendment; (3) rights under the Establishment Clause of the First Amendment; (4) statutory rights under the Administrative Procedures Act ("APA"); and (5) statutory rights under the Immigration and Nationality Act ("INA"). (*See generally* SAC.)

a.   <u>Allegations Regarding Named Plaintiffs and the Putative Class Members</u>

The SAC alleges the following with respect to the Plaintiffs listed in the caption of the pleading ("Named Plaintiffs"). Some of these allegations are corroborated by declarations submitted by Plaintiffs as part of their Motion.

i.   <u>H.M. & Najla Mohammed Hamid</u>

H.M. is a three-year-old Yemeni citizen who falls within the category of "Plaintiff 2s." (SAC ¶ 5; *see also* Decl. Amar Saleh in Supp. Certification Mot. ("Saleh Certification Decl.") ¶ 6.) Her mother, Najla Mohammed Hamid ("Hamid"), is an LPR residing in the United States who falls within the category of "Plaintiff 1s." (SAC ¶ 5; Saleh Certification Decl. ¶ 6.) In or around 2013, Hamid filed a Petition for an immigrant visa on behalf of H.M. (SAC ¶ 5.) After Hamid was interviewed, her Petition was approved. (SAC ¶ 5.) Hamid and H.M., who currently resides in Djibouti with her elderly grandfather, thereafter had their case transferred to the NVM and transferred again to the United States Embassy in Djibouti (the "Embassy"). (SAC ¶ 5; Saleh Certification Decl. ¶ 6.) H.M. has not had an interview scheduled nor has she received her IV, notwithstanding (1) that her parents have been deemed not to pose a threat to the Untied States and have received valid LPR status; (2) that Hamid's Form I-130 Petition was approved; and (3) that three-year-old H.M. is, on information and belief, neither a terrorist nor poses any threat whatsoever to the United States. (SAC ¶ 5.)

///
///
///
///

MINUTES FORM 11
CIVIL GEN                              Page 7 of 49                    Initials of Preparer _____

__ : __

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   <u>CV 17-00786 SJO (GJSx)</u>          DATE: <u>August 21, 2017</u>

      ii.   <u>Mohamed Saleh Eraga & Saba Mohamed Saeed</u>

Mohamed Saleh Eraga ("Eraga") is an adult Yemeni citizen whose wife, Saba Mohammed Saeed ("Saeed"), is a U.S. citizen who lives with their one-year-old U.S. citizen daughter in California. (SAC ¶ 6; *see also* Saleh Opening Decl. ¶ 7.) Eraga falls within the category of Plaintiff 2s, while Saeed falls within the category of Plaintiff 1s. (SAC ¶ 6.) In or around 2012, Saeed filed a Form I-130 Petition for an immigrant visa for Eraga. (SAC ¶ 6.) After Saeed was interviewed, her Petition was approved, and the case was thereafter processed with the NVC and subsequently forwarded to the Embassy in Djibouti. (SAC ¶ 6.) Eraga was interviewed at the Embassy on October 31, 2016, but he has yet to receive an adjudication on the Petition, which is currently held up in "administrative processing." (SAC ¶ 6.) On information and belief, Eraga is not a terrorist and does not pose any threat whatsoever to the United States. (SAC ¶ 6.)

      iii.   <u>Karim Hafiz Hassan Alammari & Hafiz Hassan Mohammed Alammari</u>

Karim Hafiz Hassan Alammari ("Karim Alammari") is an adult Yemeni citizen whose father, U.S. citizen Hafiz Hassan Mohammed Alammari ("Hafiz Alammari"), lives in California and whose mother is an LPR who also resides in the United States. (SAC ¶ 7; *see also* Saleh Opening Decl. ¶ 8.) In or around 1995, Hafiz Alammari filed a Form I-130 Petition on behalf of Karim Alammari, which has been pending for more than twenty years. (SAC ¶ 7.)

      iv.   <u>Class Allegations</u>

In their SAC, Plaintiffs allege that "[i]n addition to Plaintiff 1s and 2s named in the caption . . ., there are numerous other Plaintiff 1s nationwide, and Plaintiff 2 visa applicants from Yemen who are currently stuck in in [sic] Djibouti and/or other countries, all of whom have been negatively impacted by the EO1, the EO2, and the government's improper and unlawful application of the provisions thereof since the date of their execution" in various ways, including Defendants' (1) "cancellation of [immigrant visa] interviews;" (2) "failure to schedule [immigrant visa] interviews;" (3) "failure to adjudicate and/or properly process [immigrant visa] Petitions;" and (4) "placing Plaintiff 2s' [immigrant visa] applications in 'administrative processing.'" (SAC ¶ 8.) Plaintiffs further allege that "[f]or many Plaintiffs, the EO1 and EO2 are only recent events in a series of unlawful actions or failures to act that have unreasonably delayed processing of the final step in acquiring their visas." (SAC ¶ 8.) The SAC incorporates by reference the "currently pending Motion for Class Certification," alleging this document sets forth the bases for the satisfaction of "the requirements of numerosity, typicality, commonality, and adequate representation under Federal Rule of Civil Procedure 23." (SAC ¶ 8.)

As noted above, Plaintiffs have submitted in connection with their Certification Motion a list of 564 individuals whom they contend are "similarly situated" to the Named Plaintiffs. (*See* FAC ¶ 8; SAC ¶ 8; Goldberg Certification Decl. ¶ 5; List.) The List sets forth (1) the name of each

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   CV 17-00786 SJO (GJSx)          DATE: __August 21, 2017__

"Petitioner," whom Plaintiffs claim constitute "Plaintiff 1s;" (2) the name of these Petitioners' "Beneficiaries," whom Plaintiffs claim constitute "Plaintiff 2s;" and (3) the "Case Number" for each Petitioner's visa application or applications.  (*See generally* List.)

G.    Other Litigation Challenging EO-2

It bears mentioning that EO-2, like EO-1, has been the subject of significant litigation across the nation.  For example, on March 15, 2017, a judge in the District of Hawaii temporarily enjoined nationwide Sections 2 and 6 of EO-2, converting the TRO into a preliminary injunction on March 29, 2017.  *See* Order Granting Mot. for TRO, *Hawai'i v. Trump*, No. 17-cv-00050 DKW-KSC (D. Haw. Mar. 15, 2017), ECF No. 219; *Hawai'i v. Trump*, — F. Supp. 3d —, 2017 WL 1167383 (D. Haw. Mar. 29, 2017).  After determining that the two named plaintiffs, the State of Hawaii and a Muslim doctor, had established standing under Article III of the Constitution, the court concluded the plaintiffs had sufficiently demonstrated a likelihood of success on the merits on their claim that EO-2 violates the Establishment Clause and that the remaining preliminary injunction factors favored the entry of a nationwide injunction of Sections 2 and 6 of EO-2.  *See generally Hawai'i v. Trump*, — F. Supp. 3d —, 2017 WL 1167383.

The Government appealed the district court's order granting the preliminary injunction to the Court of Appeals for the Ninth Circuit, which on June 12, 2017, in a *per curiam* opinion, "affirm[ed] in large part the district court's order preliminarily enjoining Sections 2 and 6 of [EO-2]."  *Hawaii v. Trump*, — F.3d —, 2017 WL 2529640, at *1 (9th Cir. June 12, 2017) (per curiam).  Without addressing the merits of plaintiffs' Establishment Clause claim in light of the constitutional avoidance canon—citing Justice Brandeis's concurring opinion in *Ashwander v. Tennessee Valley Authority* for the proposition that "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter," 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)—the Ninth Circuit concluded that the plaintiffs had succeeded in demonstrating a likelihood of success on the merits as to their "arguments that EO2 contravenes the INA by exceeding the President's authority under § 1182(f), discriminating on the basis of nationality, and disregarding the procedures for setting annual admissions of refugees."  *Id.* at *6, *13-*23.  With respect to the question of the proper scope of the injunction, the Ninth Circuit affirmed the injunction as to Section 2(c), suspending entry of nationals from the Designated Countries for 90 days, and two aspects of Section 6 concerning refugee admission, but vacated the portions of the injunction that prevent the Government from conducting internal reviews as otherwise directed in Sections 2 and 6 and injunction to the extent that it runs against the President.  *Id.* at *29.

Meanwhile, on March 16, 2017, a judge in the District of Maryland issued a separate nationwide injunction barring enforcement of Section 2(c) of EO-2, concluding the plaintiffs in the case before him were "likely to be able to establish that Section 2(c) of [EO-2] violates the Establishment

MINUTES FORM 11
CIVIL GEN                                    Page 9 of 49                        Initials of Preparer _____

_____ : _____

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>     **DATE:** <u>August 21, 2017</u>

Clause." *Int'l Refugee Assistance Project v. Trump* ("*IRAP*"), — F. Supp. 3d —, 2017 WL 1018235, at *18 (D. Md. Mar. 16, 2017). The Government appealed the district's preliminary injunction order to an *en banc* Court of Appeals for the Fourth Circuit, which, on May 25, 2017, issued a 67-page majority opinion, a 57-page dissent, and three concurring opinions. *IRAP*, 857 F.3d 554 (4th Cir. 2017) (en banc). The majority agreed with the district court that the plaintiffs are likely to succeed on the merits of their claim that EO-2 violates the Establishment Clause, finding that "[t]he evidence in the record, viewed from the standpoint of the reasonable observer, creates a compelling case that EO-2's primary purpose is religious." *Id.* at *56. Other members of the court of appeals agreed with the majority's conclusion, but found occasion to address their views (1) as to whether 8 U.S.C. § 1152(a)(1)(A), which prohibits discrimination on the basis of nationality in the issuance of immigrant visas, operates as a limitation on the President's authority under 8 U.S.C. § 1182(f); and (2) as to whether remarks made by candidate Trump and his associates before he took his presidential oath of office can be used to establish his intent in signing EO-2. *Id.* at *81-*147. The three dissenting judges, meanwhile, concluded both the district court and the majority erred "(1) by refusing to apply the Supreme Court's decision in *Mandel*; (2) by fabricating a new proposition of law — indeed, a new rule — that provides for the consideration of campaign statements to recast a later-issued executive order; and (3) by radically extending Supreme Court Establishment Clause precedents." *Id.* at *148.

The Government filed separate petitions for certiorari to the United States Supreme Court in *IRAP* and *Hawaii v. Trump*, and on June 26, 2017 the Supreme Court granted both petitions and granted in part the Government's applications seeking stays of both lower court injunctions. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (June 26, 2017). In relevant part, the Supreme Court narrowed the nationwide injunctions imposed by the district courts to prohibit the Government from enforcing Sections 2(c), 6(a), and 6(b) of EO-2 only against "foreign nationals who have a credible claim of a **bona fide relationship** with a person or entity in the United States." *Id.* at 2088-89 (emphasis added). Given the nature of the visa petitions at issue in this case, the parties agree that none of the putative class members lack a bona fide relationship with a person or entity in the United States. (*See* Defs.' Status Report re Court's June 26, 2017 Order 1, ECF No. 88; Pl.'s Status Report re Court's June 26, 2017 Order 2-3, ECF No. 90.)

///
///
///
///
///
///
///
///
///
///

__:__

Priority  ____
Send      ____
Enter     ____
Closed    ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  **CV 17-00786 SJO (GJSx)**          DATE: **August 21, 2017**

---

  H.  <u>The Recent History of Immigrant Visa Processing for Yemeni Applicants</u>

On April 28, 2016, the Embassy of the United States located in Sana'a, Yemen, issued a press release in which it stated, in relevant part, that:

> [b]eginning with appointments in June 2016, the U.S. Department of State is scheduling immigrant visa appointments for Yemeni applicants at the U.S. Embassy in Djibouti instead of the U.S. Embassy in Algeria in order to prevent delays and move more applicants to the interview stage.  The U.S. Embassy in Djibouti no longer requires applicants to be physically present in the country prior to transferring their case.  Interviews are being scheduled in order of the date the case became documentarily qualified and eligible for scheduling.

*See* Immigrant Visa Processing, EMBASSY OF THE UNITED STATES, SANA'A, YEMEN (updated Apr. 28, 2016), https://yemen.usembassy.gov/immigrant_visas.html. This press release further stated that petitioners with interviews already scheduled in Algeria would not have their interviews cancelled, but instead would have their case returned to the NVC, which would assign the case to the U.S. Embassy in Djibouti.  *Id.*  In response to the question "I've been waiting a long time for an interview.  When will you give me an appointment?" the press release stated:

> Given the high demand for visa appointments worldwide, you should **expect to wait several months – if not longer – before we can schedule an interview for your case**.  Interviews are scheduled in order of the date the case became documentarily qualified and eligible for scheduling.  NVC will contact you by mail or email when there is an appointment available.  You do not need to take any action at this time unless instructed or if you want to request a case transfer.

> Please note that any decision to take on costs associated with travel and stay in a third country for the purpose of the visa interview is at the applicant's discretion.  Most countries have strict immigration rules regarding overstay, and it is the applicant's sole responsibility to maintain their legal stay while remaining in a third country for their visa interview and processing.

*Id.* (emphasis added).

///
///
///
///
///
///

MINUTES FORM 11
CIVIL GEN               Initials of Preparer _____

__ : __

| | |
|---|---|
| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>        **DATE:** <u>August 21, 2017</u>

II.   <u>LEGAL STANDARDS</u>

A.   <u>Class Certification</u>

"Federal Rule of Civil Procedure 23, which governs class certification, contains two distinct sets of requirements."  *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.* ("*United Steel*"), 593 F.3d 802, 806 (9th Cir. 2010). "Rule 23(a) outlines four requirements, all of which must be met for class certification:  (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the class representatives must be typical of the claims or defenses of the class; and (4) the class representatives must fairly and adequately protect the interests of all members of the class." *Id.* (citing Fed. R. Civ. P. 23(a)).  "The four requirements of Rule 23(a) are commonly referred to as 'numerosity,' 'commonality,' 'typicality,' and 'adequacy of representation' (or just 'adequacy'), respectively." *Id.* (citing *Rodriguez v. Hayes*, 578 F.3d 1032, 1047-51 (9th Cir. 2009)).

"Where a putative class satisfies all four requirements of Rule 23(a), it still must meet at least one of three additional requirements outlined in Rule 23(b) in order to be eligible for certification." *Id.* Rule 23(b) provides that:

> [a] class action may be maintained if Rule 23(a) is satisfied and if:
> (1)   prosecuting separate actions by or against individual class members would create a risk of:
>    (A)   inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>    (B)   adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
> (2)   the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
> (3)   the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>    (A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
>    (B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). Plaintiffs argue the requirements of Rules 23(b)(1)(A), (b)(1)(B), and (b)(2), which are discussed in greater detail in Section III, *infra*, are met in this litigation.

"The party seeking class certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *United Steel*, 593 F.3d at 807 (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). A "district court facing a class certification motion is required to conduct 'a rigorous analysis' to ensure that the Rule 23 requirements are satisfied." *Conn. Retirement Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

>      B.     The Family-Based Immigrant Visa Approval and Issuance Process

It comes as no surprise that the laws and regulations relating to immigration into the United States are labyrinthine. It is amidst the intricate passageways of this labyrinth that the issues presented in this case lie. In light of the complexity of our immigration system, relevant provisions of the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ("INA") and regulations promulgated thereunder are set described below.

>             1.     The Immigration and Nationality Act

>                  a.     Overview of Requirements to Be Admitted to the United States

The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ("INA"), governs the admission of aliens into the United States. Section 211 of the INA provides, subject to certain exceptions, "**no immigrant shall be admitted** into the United States **unless** at the time of application for admission he (1) has a **valid unexpired immigrant visa** or was born subsequent to the issuance of such visa of the accompanying parent, and (2) presents a valid unexpired passport or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General." 8 U.S.C. § 1181(a) (emphasis added). The process of applying for a visa includes, among other things, (1) registration; (2) the submission of passports, signed photographs, and other documents; (3) an in-person interview; and (4) both physical and mental examinations. *See* 8 U.S.C. § 1201(b), (d) ("Prior to the issuance of an immigrant visa to any alien, the consular officer shall require such alien to submit to a physical and mental examination in accordance with such regulations as may be prescribed. Prior to the issuance of a nonimmigrant visa to any alien, the consular officer may require such alien to submit to a physical or mental examination, or both, if in his opinion such examination is necessary to ascertain whether such alien is eligible to receive a visa."). The INA further defines

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  CV 17-00786 SJO (GJSx)          DATE: **August 21, 2017**

categories of aliens who **cannot** be admitted to the United States, such as persons whom "a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity . . . ." *See id.* § 1182(a)(3)(B)(i)(II). Finally, "[n]othing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted the [sic] United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law." *Id.* § 1201(h).

        b.    <u>The Visa Application Process at Issue Here Begins with an Eligible Relative Filing a Form I-130 Petition</u>

One means by which an alien can lawfully immigrate to the United States begins with the submission of a Form I-130 Petition to USCIS by an eligible relative (who must be either a U.S. citizen or an LPR).  *See* 8 U.S.C. § 1154(a)(1)(A)(i); 8 C.F.R. § 204.1(a)(1).  Pursuant to these authorities, U.S. citizens can file Form I-130 Petitions for their spouse, unmarried children, siblings, and parents, while LPRs can only file petitions for their spouses and unmarried children. 8 C.F.R. §§ 204.1(a)(1), 204.2.  Such petitions must be accompanied by, among other things, "evidence of the claimed relationship." *See* 8 C.F.R. § 204.2(a)(2), (d)(2), (f)(2), (g)(2); *see also* 8 U.S.C. § 204.1(f), (g) (requiring the submission of supporting documentation and evidence).

The procedure for approving petitions such as Form I-130 Petitions and granting preference statuses is set forth in Section 204 of the INA.  This section provides in part that:

> [a]fter an investigation of the facts in each case, and after consultation with the Secretary of Labor with respect to petitions to accord a status under section 1153(b)(2) or 1153(b)(3) of this title, the Attorney General shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative specified in section 1151(b) of this title . . ., **approve the petition** and forward one copy thereof to the Department of State. The Secretary of State shall then **authorize the consular officer** concerned to **grant the preference status**.

8 U.S.C. § 1154(b) (emphasis added).  That said, the statute prohibits the admission of aliens where the Attorney General has determined that a marriage was entered into for the purpose of evading the immigration laws, and further provides that "[n]othing in this section shall be construed to entitle an immigrant, in behalf of whom a petition under this section is approved, to be admitted [sic] the United States as an immigrant under subsection (a), (b), or (c) of section 1153 of this title or as an immediate relative under section 1151(b) of this title if upon his arrival at a port of entry in the United States he is found not to be entitled to such classification." *Id.* § 1154(c), (e).  The subsequent section provides that "[t]he Secretary of Homeland Security may, at any time, for what

| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **CV 17-00786 SJO (GJSx)**          **DATE:** **August 21, 2017**

he deems to be good and sufficient cause, revoke the approval of any petition approved by him under section 1154 of this title.  Such revocation shall be effective as of the date of approval of any such petition."  *Id.* § 1155.

c.     Possessing an Approved Form I-130 Petition Does Not Authorize an Alien to Enter the U.S.—Steps Must Be Taken Before a Visa Issues

The fact that a Form I-130 Petition has been "approved" does not entitle the beneficiary of that petition to lawfully enter the United States.  As noted above, Section 211 of the INA mandates that an immigrant may only be admitted into the United States if, among other things, he or she has a **valid, unexpired immigrant visa** at the time of application for admission. 8 U.S.C. § 1181(a). The steps required to obtain such a visa, as well as certain hurdles, are outlined below,.

First, as noted in Section II(B)(1)(a), *supra*, the process of applying for a visa typically includes, among other things, (1) registration; (2) the submission of passports, signed photographs, and other documents; (3) an in-person interview; and (4) both physical and mental examinations.  *See* 8 U.S.C. § 1201(b), (d); § 1202(b), (e), (h).  Indeed,  the INA requires that "[e]very alien applying for an immigrant visa and for alien registration **shall make application therefor** in such form and manner and at such place as shall be by regulations prescribed."  8 U.S.C. § 1202(a) (emphasis added).  Details regarding these requirements are set forth in the regulations described in Section II(B)(2), *infra*.

Second, the INA places special restrictions on how many "family-sponsored immigrants" can be admitted in a fiscal year.  Although the INA does not place a limit on the number of "children, spouses, and parents of a citizen of the United States" who can be admitted to the United States, it does set a "worldwide level of family-sponsored immigrants" who may be admitted in a fiscal year.  *See* 8 U.S.C. §§ 1151(b)(2)(A)(i) & (c).  Such immigrants include those whose family members are LPRs, as well as those who have a more distant relationship to their U.S. citizen petitioners.  In light of these limits, the INA contains a mechanism by which visas for such family-sponsored immigrants shall be allotted.  *Id.* § 1153(a), (e).

Next, pursuant to Section 203(e), "[i]mmigrant visas made available under subsection (a) or (b) shall be issued to eligible immigrants **in the order in which a petition** in behalf of each such immigrant is **filed** with the Attorney General . . . as provided in section 1154(a) of this title."  8 U.S.C. § 1153(e)(1) (emphasis added).  "**Waiting lists** of applicants for visas under this section shall be maintained in accordance with regulations prescribed by the Secretary of State."  *Id.* § 1153(e)(3) (emphasis added).  Furthermore, "[f]or purposes of carrying out the Secretary's responsibilities in the orderly administration of this section, the Secretary of State may make reasonable estimates of the anticipated numbers of visas to be issued during any quarter of any

MINUTES FORM 11                                                                                                    __ : __
CIVIL GEN                                                                 Initials of Preparer _____

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>**August 21, 2017**</u>

fiscal year within each of the categories under subsections (a), (b), and (c) and to rely upon such estimates in authorizing the issuance of visas." *Id.* § 1153(g).

Ultimately, Section 281 of the INA provides that:

> [u]nder the **conditions** hereinafter prescribed and subject to the **limitations** prescribed in this chapter or regulations issued thereunder, a consular officer **may** issue . . . to an immigrant who has made proper application therefor, an **immigrant visa** which shall consist of the application provided for in section 1202 of this title, visaed by such consular officer, and shall specify the foreign state, if any, to which the immigrant is charged, the immigrant's particular status under such foreign state, the preference, immediate relative, or special immigrant classification to which the alien is charged, the date on which the validity of the visa shall expire, and such additional information as may be required[.]

8 U.S.C. § 1201(a) (emphasis added). Moreover, "[a] consular officer **may**, subject to the **limitations** provided in section 1201 of this title, issue an immigrant visa to a special immigrant or **immediate relative** as such upon satisfactory proof, under regulations prescribed under this chapter, that the applicant is entitled to special immigrant or immediate relative status." *Id.* § 1204 (emphasis added).

2.    <u>Relevant Regulations Promulgated Under the INA</u>

The Court next examines the relevant regulations promulgated under the INA and groups the regulations into respective subparts found in Title 22, Chapter I of the Code of Federal Regulations ("CFR").

a.    <u>Subpart E Regulations</u>

Regulations found in Subpart E describe the impact of an approved petition under the INA. For example, Section 42.41 provides that:

> Consular officers are authorized to grant to an alien the immediate relative or **preference status** accorded in a **petition approved** in the alien's behalf upon receipt of the approved petition or official notification of its approval. The status shall be granted for the period authorized by law or regulation.

22 C.F.R. § 42.41 (emphasis added). The regulation goes on to clarify, however, that "[t]he **approval of a petition does not relieve** the alien of the **burden of establishing** to the

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CIVIL MINUTES - GENERAL**

CASE NO.:  __CV 17-00786 SJO (GJSx)__          DATE: __August 21, 2017__

satisfaction of the consular officer that the alien is **eligible in all respects to receive a visa**." *Id.* (emphasis added).

This is because, as Section 42.42 provides:

> [t]he consular officer **may not issue** a visa to an alien as an immediate relative entitled to status under 201(b), a family-sponsored immigrant entitled to preference status under 203(a)(1)-(4) . . ., **unless** the officer has **received a petition filed and approved in accordance with INA 204** or official notification of such filing and approval.

22 C.F.R. § 42.42 (emphasis added).

Finally, Section 42.43 provides that:

> The consular officer **shall suspend action** in a petition case and return the petition, with a report of the facts, for reconsideration by DHS . . . if the **officer knows or has reason to believe** that **approval** of the petition was obtained by fraud, misrepresentation, or other unlawful means, or that the beneficiary is not entitled, for some other reason, to the status approved.

*Id.* § 42.43 (emphasis added).

        b.    <u>Subpart F Regulations</u>

Subpart F contains regulations concerning numerical controls and priority dates. Section 42.51 provides, in relevant part:

> (a)    Centralized control. Centralized control of the numerical limitations on immigration specified in INA 201, 202, and 203 is established in the Department. The Department shall limit **the number of immigrant visas** that may be issued and the number of adjustments of status that may be granted to aliens subject to these numerical limitations to a number:
> (1)    Not to exceed 27 percent of the world-wide total made available under INA 203 (a), (b) and (c) in any of the first three quarters of any fiscal year; and
> (2)    Not to exceed, in any month of a fiscal year, 10% of the world-wide total made available under INA 203 (a), (b) and (c) plus any balance remaining from authorizations for preceding months in the same fiscal year.

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**  <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

(b)     Allocation of numbers.  Within the foregoing limitations, the Department shall **allocate immigrant visa numbers** for use in connection with the issuance of immigrant visas and adjustments based on the **chronological order of the priority dates of visa applicants classified under INA 203 (a)** and (b) reported by consular officers pursuant to § 42.55(b) . . . .

(c)     Recaptured visa numbers.  An immigrant visa number shall be returned to the Department for **reallocation** within the fiscal year in which the visa was issued when:

    (1)     An immigrant having an immigrant visa is excluded from the United States and deported;

    (2)     An immigrant does **not apply for admission to the United States before the expiration of the validity of the visa**;

    (3)     An alien having a preference immigrant visa is found not to be a preference immigrant; or

    (4)     An immigrant visa is **revoked** pursuant to § 42.82.

22 C.F.R. § 42.51 (emphasis added).  Section 42.52, in turn, provides:

(a)     Waiting list.  Records of individual visa applicants entitled to an immigrant classification and their priority dates shall be maintained at posts at which immigrant visas are issued.  These records shall indicate the **chronological and preferential order** in which consideration may be given to immigrant visa applications within the several immigrant classifications subject to the numerical limitations specified in INA 201, 202, and 203. . . .  The records which pertain to applicants subject to numerical limitations constitute "waiting lists" within the meaning of INA 203(e)(3) as redesignated by the Immigration Act of 1990.

(b)     Entitlement to immigrant classification.   An alien shall be **entitled to immigrant classification** if the **alien**:

    (1)     Is the **beneficiary of an approved petition** according immediate relative or preference status . . . .

(c)     Record made when entitlement to immigrant classification is established.

    (1)     A **record** that an alien is **entitled to an immigrant visa classification** shall be made whenever the consular officer is satisfied—or receives evidence—that the alien is within the criteria set forth in paragraph (b) of this section.

    (2)     A separate record shall be made of family members entitled to derivative immigrant status whenever the consular officer determines that a spouse or child is chargeable to a different foreign state or other numerical limitation than the principal alien.  The provisions of

| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

**CASE NO.:**   <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

               INA 202(b) are to be applied as appropriate when either the spouse or parent is reached on the waiting list.

(3)    A separate record shall be made of a spouse or child entitled to derivative immigrant status whenever the consular officer determines that the principal alien intends to precede the family.

*Id.* § 42.52 (emphasis added).

Section 42.53 governs priority dates for individual applicants, and provides (1) that "[t]he **priority date** of a preference visa applicant under INA 203 (a) or (b) shall be the **filing date of the approved petition** that accorded preference status[;]" and (2) that "[a] spouse or child of a principal alien acquired prior to the principal alien's admission shall be entitled to the priority date of the principal alien, whether or not named in the immigrant visa application of the principal alien." *Id.* § 42.53 (emphasis added).

Section 42.54, titled "order of consideration," provides that "[c]onsular officers shall request applicants to take the steps necessary to meet the requirements of INA 222(b) in order to apply formally for a visa . . . [i]n the **chronological order of the priority dates** of all applicants within each of the immigration classifications specified in INA 203 (a) and (b)[.]" *Id.* § 42.54 (emphasis added).

c.    <u>Subpart G Regulations</u>

The regulations in Subpart G contain details regarding the application process for immigrant visas, which lie at the heart of this case. First, Section 42.61 generally requires that aliens applying for immigrant visas must apply at the consular office having jurisdiction over the alien's place of residence, but provide certain exceptions. 22 C.F.R. § 42.61(a). This section also permits the transfer of "[a]ll documents, papers, and other evidence relating to an applicant . . . to another post," but provides that "[i]n no case may a visa number be transferred from one post to another." *Id.* § 42.61(b).

Section 42.62, in turn, mandates that "[e]very alien applying for an immigrant visa . . . shall be **required to appear personally** before a consular officer for the execution of the application . . . ." 22 C.F.R. § 42.62(a) (emphasis added). This section further provides that the consular official "shall determine on the basis of the applicant's representations and the visa application and other relevant documentation" both the "proper immigrant classification, if any, of the visa applicant," and the "applicant's eligibility to receive a visa." *Id.* § 42.62(b). Similarly, Section 42.66 requires that "every alien, regardless of age," must "undergo a **medical examination** in order to determine eligibility to receive a visa." *Id.* § 42.66 (emphasis added).

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>　　　**DATE:** <u>August 21, 2017</u>

In addition, Sections 42.64 and 42.65 together require the submission of **passports** and "documents considered necessary to establish the alien's eligibility to receive an immigrant visa," such as copies of police certificates, existing prison and military records, **records of birth**, and photographs.  22 C.F.R. §§ 42.64, 42.65.

Next, Section 42.63 provides that "[e]very alien applying for an immigrant visa must make application, as directed by the consular officer, on **Form DS-230**, Application for Immigrant Visa and Alien Registration, or on **Form DS-260**, Electronic Application for Immigrant Visa and Alien Registration.  This requirement may not be waived." 22 C.F.R. § 42.63(a)(1) (emphasis added).  "The consular officer shall ensure that Form DS-230 or Form DS-260 and all other forms an alien is required to submit are fully and properly completed in accordance with the applicable regulations and instructions," and the officer is entitled to "require the submission of additional information or question the alien on any relevant matter whenever the officer believes that the information provided in Form DS-230 or Form DS-260 is inadequate to determine the aline's eligibility to receive an immigrant visa."  *Id.* § 42.63(c).

Finally, Section 42.67 sets forth requirements for the execution of applications, registration, and fingerprinting.  First, "[a] **fee** is prescribed for each application for an immigrant visa" that "shall be collected prior to the execution of the application . . . ."  22 C.F.R. § 42.67(a)(1) (emphasis added).  **Oaths and signatures** are required in connection with the submission of Form DS-230 or Form DS-260.  *Id.* § 42.67(a)(2)-(3).  Applicants must also furnish **fingerprints** prior to the execution of Form DS-230 or Form DS-260.  *Id.* § 42.67(c).  Finally, Section 42.67(b) provides that an alien "shall be considered to be registered for the purposes of INA 221(b) and 203(g) upon the filing of Form DS–230 or Form DS–260, when duly executed, or the transmission by the Department to the alien of a notification of the availability of an immigrant visa, whichever occurs first."  *Id.* § 42.67(b).

　　　　d.　　<u>Regulations in Subparts H and I</u>

The regulations located in Subpart H concern the physical issuance of immigrant visas, while those located in Subpart I concern the refusal, revocation, and termination of immigrant registrations.  To begin, Section 42.71 provides that:

　　　(a)　　Authority to issue visas.  **Consular officers may issue** immigrant visas at designated consular offices abroad pursuant to the authority contained in INA 101(a)(16), 221(a), and 224. . . .

　　　(b)　　Immigrant visa fees.  The Secretary of State prescribes a **fee** for the processing of immigrant visa applications.  An individual registered for immigrant visa processing at a post designated for this purpose by the Deputy Assistant Secretary for Visa Services must pay the processing fee upon being notified that a visa is expected to

__ : __

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**   <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

become available in the near future and being requested to obtain the supporting documentation needed to apply formally for a visa. . . .

22 C.F.R. § 42.71 (emphasis added).

Importantly, Section 42.81provides that "[w]hen a visa application has been properly completed and executed before a consular officer in accordance with the provisions of INA and the implementing regulations, the consular officer **must either issue or refuse** the visa under INA 212(a) or INA 221(g) or other applicable law."  22 C.F.R. § 42.81(a) (emphasis added).  The United States Foreign Affairs Manual underscores this point, stating "[t]here are no exceptions to the rule that once a visa application has been properly completed and executed before a consular officer a visa must be either issued or refused. . . .  There is no such thing as an informal refusal or a pending case once a formal application has been made."  9 FAM 42.81 N1.

Section 42.83 provides that "[i]n accordance with INA 203(g), an alien's **registration** for an immigrant visa shall be **terminated if**, within one year after transmission of a notification of the availability of an immigrant visa, the applicant **fails to apply for an immigrant visa**."  22 C.F.R. § 42.83(a) (emphasis added).  This section further provides that "[a]n alien's registration for an immigrant visa shall be terminated if, within one year following the refusal of the immigrant visa application under INA 221(g), the alien has failed to present to a consular officer evidence purporting to overcome the basis for refusal."  *Id.* § 42.83(b).

Finally, Section 42.82 provides that "[a] consular officer, the Secretary, or any Department official to whom the Secretary has delegated this authority is authorized to revoke an immigrant visa at any time, in his or her discretion."  22 C.F.R. § 42.82(a).

    C.    <u>The Justiciability Doctrines of Standing and Ripeness</u>

        1.    <u>Standing</u>

Article III, Section 2 of the Constitution permits federal courts to consider only "cases" and "controversies."  *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007).  "One of th[e] landmarks . . . setting apart the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III—'serv[ing] to identify those disputes which are appropriately resolved through the judicial process,' *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S. Ct. 1717, 1722, 109 L.Ed.2d 135 (1990)—is the doctrine of standing."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" and limits who may "maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo, Inc. v. Robins*, — U.S. —, 136 S.Ct. 1540, 1547 (2016).

____ : ____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  __CV 17-00786 SJO (GJSx)__          DATE: __August 21, 2017__

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

"The party invoking federal jurisdiction bears the burden of establishing these elements."  *Id.* (citations omitted).  "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citations omitted).  Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Id.* (citation omitted).

Relatedly, binding authority holds that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."  *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (citations omitted); *see also Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001) ("A named plaintiff cannot represent a class alleging constitutional claims that the named plaintiff does not have standing to raise.").

2.    Ripeness

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Nat'l Park Hosp. Ass'n v. Dep't of Interior* ("*NPHA*"), 538 U.S. 803, 808 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).  The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57, n. 18 (1993) (citations omitted). "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *NPHA*, 538 U.S. at 808 (quoting *Abbott Labs.*, 387 U.S. at 149).

///
///
///

MINUTES FORM 11
CIVIL GEN                           Page 22 of  49                    __ : __
                                                         Initials of Preparer _____

| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

**CASE NO.:**   CV 17-00786 SJO (GJSx)          **DATE:** <u>August 21, 2017</u>

D.      Rule 21 of the Federal Rules of Civil Procedure

Rule 21 of the Federal Rules of Civil Procedure ("Rule 21") authorizes a court to "sever any claim against a party."  Fed. R. Civ. P. 21; *Goodwin v. Citywide Home Loans, Inc.*, No. SACV 14-866 JLS (JCGx), 2014 WL 5327191, at *4 (C.D. Cal. Oct. 17, 2014).  A court has "broad discretion to sever claims."  *Trazo v. Nestle USA, Inc.*, No. 5:12-CV-02272-PSG, 2013 WL 12214042, at *2 (N.D. Cal. Dec. 4, 2013); *see also Davis v. Mason Cnty.*, 927 F.2d 1473, 1479 (9th Cir. 1991). In deciding whether to sever an action under Rule 21, courts consider: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.  *Trazo*, 2013 WL 12214042, at *2.

E.      Rule 12(b)(1) of the Federal Rules of Civil Procedure

A defendant may move to dismiss an action for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).   In a factual attack, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Id.*  When a party challenges the veracity of the allegations supporting subject matter jurisdiction "a court may look beyond the complaint to matters of public record."  *White*, 227 F.3d at 1242.  In a facial attack, the movant "accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted).

"The burden of establishing subject matter rests on the party asserting that the court has jurisdiction."  *In re Wilshire Courtyard*, 729 F.3d 1279, 1284 (9th Cir. 2004) (citations omitted). "[T]he motion is granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction."  *Nichols*, 945 F. Supp. 2d at 1093 (citing *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011)).

F.      Rule 12(b)(6) of the Federal Rules of Civil Procedure

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), an action may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Dismissal is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.  *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>        **DATE:** <u>August 21, 2017</u>

When considering a motion to dismiss, the court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Furthermore, the court must construe the well-pleaded factual allegations in the light most favorable to the non-moving party. *Vasquez v. L.A. County*, 487 F.3d 1246, 1249 (9th Cir. 2007). The complaint must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content', and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). "In deciding a motion to dismiss, the court can consider only the pleadings and documents that are incorporated by reference therein or are properly the subject of judicial notice." *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1020 (C.D. Cal. 2015).

When granting a motion to dismiss for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

III.    <u>DISCUSSION</u>

    A.    <u>Overview</u>

In their Certification Motion, Plaintiffs move the Court to certify the following class pursuant to Rules 23(a), (b)(1)(A) and (B), and (b)(2):

> U.S. citizens and LPRs, as well as their immediate relatives who are neither U.S. citizens nor LPRs, whose I-130 Petitions for Alien Relative were approved, who have escaped war in Yemen, and who are currently in Djibouti in reliance on the Government's completion of the "final steps."

(*See, e.g.*, Certification Mot. at i.) Plaintiffs also seek to be appointed as Class Representatives and to have their counsel, Julie A. Goldberg and Daniel Covarrubias-Klein of the law firm Goldberg & Associates, appointed as Class Counsel. (Certification Mot. at i.) According to Plaintiffs, certification is appropriate because Defendants' policies and practices prior to and in the aftermath of President Trump's signing of EO-1 have resulted in (1) improper delays in the issuance of immigrant visas; (2) cancellations or interruptions of already scheduled immigrant visa interviews; and (3) inaction vis-à-vis immigrant visa interview scheduling, which have affected the six Named Plaintiffs and the other 564 identified petitioners and beneficiaries in a similar manner. (*See* Certification Mot. 1.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | |
|---|---|
| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

CASE NO.:  **CV 17-00786 SJO (GJSx)**          DATE: **August 21, 2017**

Defendants identify five (5) reasons why they believe certification is not appropriate in this case. First, they argue that the six named Plaintiffs lack standing under Article III of the United States Constitution insofar as these individuals seek to assert unripe claims.  (*See* Certification Opp'n 1, ECF No. 77.)  Second, Plaintiffs' claims fail to meet the requirements of commonality under Rule 23(a)(2) and of typicality under Rule 23(a)(3).  (Certification Opp'n 1.)  Third, Plaintiffs are inadequate representatives of the proposed class. (Certification Opp'n 1-2.) Fourth, Plaintiffs "fail to proffer a class definition in any of their complaints, and proffer an overbroad class that is inadequately defined in their Motion for Class Certification." (Certification Opp'n 2.) Finally, they submit that Plaintiffs have failed to demonstrate that Defendants have acted or refused to act on grounds generally applicable to the class or that, even if such a  showing was made, that certification of a nationwide class would not be warranted in this case.  (Certification Opp'n 2.)

In their Dismissal Motion, Defendants move the Court to sever and dismiss Plaintiffs' Mandamus Claims in part under Rule 21 and in part pursuant to the doctrine of consular nonreviewability. (*See generally* Dismissal Mot., ECF No. 85.)  Defendants argue that Plaintiffs' Mandamus Claims do not arise out of the same transaction or occurrence, do not present common questions of law, require different presentation of evidence, and that litigating the claims together would not promote judicial economy or settlement.  (Dismissal Mot. 7-14.)  Alternatively, they submit that Plaintiffs' Mandamus Claims must be dismissed to the extent that they challenge not merely the delay of Plaintiffs' applications, but also the denial of any visas.  (Dismissal Mot. 14.)

Separate from their request to sever Plaintiffs' Mandamus Claims, Defendants contend that dismissal of Plaintiffs' declaratory relief claims related to EO-1 is warranted because this order was expressly revoked by EO-2 such that any claims related to the first order have become moot. (Dismissal Mot. 14.)  Plaintiffs argue that EO-1 "has not yet been revoked and will not be revoked until the Supreme Court has issued a ruling on the injunctions taken under certiorari for the October term." (Dismissal Opp'n 9, ECF No. 93.)

Before addressing the merits of the interrelated arguments presented in the motions, the Court finds occasion to note that Plaintiffs' amorphous theory of their case and the lack of evidence they have introduced has made it difficult for Defendants to comprehend their arguments and for the Court to assess the merits of their case.  At the outset of this case, Plaintiffs took issue with events that occurred "[i]n the wake of the [first] Executive Order," challenging the legality of EO-1 on a number of grounds. (*See* Compl. ¶¶ 18-44.)  Their FAC was similarly focused on EO-1, but for the first time included four paragraphs describing the "extreme wait times and delays in adjudication" of many of their Petitions, which Plaintiffs allege are attributable to "corruption" in the U.S. Embassy in Sana'a, Yemen and "hostilities" raging between rivaling factions in the Yemeni civil war. (*See* FAC ¶¶ 19-65; 66-69.)  Similar generalized allegations can be found in the SAC.  (*See* SAC at 2, ¶¶ 91-95.)  In their Motion, however, Plaintiffs argue that the harms that have befallen them "are the result of, and directly emanate from, [President] Trump's execution

MINUTES FORM 11
CIVIL GEN

          __ : __

Initials of Preparer _____

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **CV 17-00786 SJO (GJSx)**        **DATE:** **August 21, 2017**

of the EO," but add that "the EO has augmented and exacerbated pre-existing delays in the processing of Plaintiffs['] [immigrant visas]." (Certification Mot. 1.) In their Reply, Plaintiffs argue that the Defendants "have engaged in purposeful and illegal discriminatory practices of delaying the adjudication of Plaintiffs and the putative class's [immigrant visa petitions] at the direction of the President of the United States due to their religion and national origin . . . ." (Certification Reply 1, ECF No. 95.) Because each of Plaintiffs' causes of action centers on a theory that EO-1 and EO-2 are unlawful and because Plaintiffs have claimed on numerous occasions that the allegedly wrongful conduct in this case was undertaken at the direction of President Trump, the Court disregards vague references to the "past improprieties" of previous administrations.

The Court begins by jointly addressing the justiciability arguments Defendants raise both in their Dismissal Motion and in their opposition to the Certification Motion. It then analyzes whether Plaintiffs have met their burden of demonstrating that the requirements of Rule 23 are satisfied. Finally, it considers the remaining arguments presented in the Dismissal Motion.

      B.    Justiciability Challenges

Defendants first argue that class certification is inappropriate both because certain Named Plaintiffs and putative class members lack Article III standing and because others are seeking to assert unripe claims. (Certification Opp'n 10.) Defendants contend that **none** of the six Named Plaintiffs have claims that are justiciable. The Court addresses these arguments in turn.

      1.    Standing and Mootness

Defendants offer several reasons why certain Named Plaintiffs and putative class members either lack standing or seek to assert claims that are now moot. First, they submit that two Named Plaintiffs—Eraga and Saeed—and petitioners and beneficiaries associated with sixty-five (65) case numbers identified in the List lack standing to pursue their claims either because these individuals have been issued immigrant visas or because their immigrant visa applications have been adjudicated and refused for reasons unrelated to EO-1 and EO-2. (*See* Certification Opp'n 10-13.) In support of these and other arguments, Defendants primarily rely on the declaration of Chloe Dybdahl, who avers she is employed by the Department of State as Chief of the Legal Affairs, Advisory Opinions Division of the Visa Office, Bureau of Consular Affairs. (Decl. Chloe Dybdahl in Supp. Certification Opp'n ("Dybdahl Certification Decl.") ¶ 1, ECF No. 77-1.) According to Ms. Dybdahl, she is authorized to search the electronic Consular Consolidated Database ("CCD") of the U.S. Department of State, Bureau of Consular Affairs, for replicated records of immigrant and nonimmigrant visas adjudicated at U.S. embassies and consular posts overseas. (Dybdahl Certification Decl. ¶ 1.) She swears that the CCD "contains replicated electronic data recording visa applications, and visas issued and refused at U.S. diplomatic and consular posts worldwide." (Dybdahl Certification Decl. ¶ 2.) She also declares that, as part of this case, she has

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**   CV 17-00786 SJO (GJSx)           **DATE:** <u>August 21, 2017</u>

reviewed both the SAC and the List and has searched the CCD using the information in these documents.  (Dybdahl Certification Decl. ¶¶ 3-4.)

In support of their argument that certain individuals either lack standing to bring suit or have had their claims mooted by subsequent events, Defendants first point to evidence demonstrating Eraga was issued an immigrant visa on February 23, 2017 as the beneficiary for an application filed by petitioner Saeed.  (Dybdahl Certification Decl. ¶ 13.)  They next cite evidence that individuals associated with **sixty-five (65)** case numbers recited in the List have been **issued** immigrant visas, including (1) Haifa Rageh and her five children, based on the application filed by petition Ali Abdo Abdullah; and (2) Jamila Saleh (or perhaps Gamila Abdullah Ahmed Mohammed) and "five derivative visa applicants," based on the application filed by petitioner Abdullah Ahmed.  (*See* Dybdahl Certification Decl. ¶¶ 4, 7, 12-13.)[2]

Defendants have also adduced evidence indicating petitioners and beneficiaries associated with **fifty-one (51)** case numbers have had their immigrant visa applications **denied** for reasons wholly unrelated to EO-1 and EO-2.  For example, Defendants have provided evidence that Ameera Saleh—who appears twice on the List as a "beneficiary" with the same case number, SAA2006762013, associated with the same petitioner, Sultan Alsharif—had her self-petitioned widow-based application refused on April 26, 2017.  (Dybdahl Certification Decl. ¶ 6.)  They have also introduced evidence that beneficiary Diana Thabet Alawi was twice refused an immigrant visa in 2001 in connection with applications filed by petitioner Thabet Mashoor Alawi.  (Dybdahl Certification Decl. ¶ 5.)  Finally, they reference petitioner Soud Mohamed and beneficiary Dikra Mohamed, whose application was refused on July 22, 2001 and who contacted the consular section at the U.S. Embassy in Djibouti on May 4, 2017 regarding how to initiate a new visa application.  (Dybdahl Certification Decl. ¶ 11.)  That said, although Defendants argue in their Opposition that "Sixty-five (60) [sic] cases involving the Doe Plaintiffs have had their visa applications adjudicated and refused for reasons separate and apart from" EO-1 and EO-2, the cited paragraphs from Ms. Dybdahl's declaration do not fully support this claim.  (*Compare* Certification Opp'n 12; *with* Dybdahl Certification Decl. ¶¶ 4, 11.)[3]

---

[2]  On August 14, 2017, Defendants filed an *Ex Parte* Application for Leave to File a Supplemental Declaration of Chloe Dybdahl ("Supplemental Dybdahl Certification Declaration") updating the status of the Named and Doe Plaintiffs' visa cases as of August 2, 2017.  (ECF No. 98.)  The Court granted the Application on August 15, 2017.  (ECF No. 99.)  In the Supplemental Declaration, Ms. Dybdahl avers that as of August 2, 2017, **eighty-five (85)** case numbers recited in the List have been **issued** immigrant visas.  (Suppl. Dybdahl Certification Decl. ¶ 9, ECF No. 98-2.)

[3]  In the Supplemental Declaration, Ms. Dybdahl avers that as of August 2, 2017, **eighty-four (84)** case numbers have had their visa applications **denied**.  (Suppl. Dybdahl

____ : ____

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:   CV 17-00786 SJO (GJSx)          DATE: **August 21, 2017**

Plaintiffs, for their part, argue in their Reply that Defendants' assertions regarding certain Named Plaintiffs are "undeniably false," and dedicate two pages of argument to claimed inaccuracies with respect to the applications of (1) Karim and Hafiz Alammari and (2) Hamid and H.M. (Certification Reply 4-5.) Conspicuously absent from Plaintiffs' Reply, however, is **evidence** corroborating their assertions.  The Court will not accept such uncorroborated assertions.[4]

In light of the foregoing, the Court concludes that although Eraga, Saeed, and those putative class members who have been **issued** immigrant visas after the signing of EO-1 have standing to bring suit because the elements of standing are determined by "look[ing] at the facts as they exist at the time the complaint was filed," *American Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1015 (9th Cir.2006), these individuals' claims for declaratory and injunctive relief have since become moot.  *See Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) ("If there is no longer a possibility that an appellant can obtain relief for his claim, that claim is moot and must be dismissed for lack of jurisdiction.") (quoting *Ruvalcaba v. City of L.A.*, 167 F.3d 514, 521 (9th Cir. 1999)); *see also Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Kerry* ("*Nine Iraqi Allies*"), 168 F. Supp. 3d 268, 282-83 (D.D.C. 2016) (holding that because three plaintiffs challenging the Department of State's failure to timely adjudicate special immigrant visas "have clearly received final decisions granting their SIV applications . . . their claims are moot, and they have no standing to litigate the case").  The Court **DISMISSES** from this action petitioners and beneficiaries associated with the eighty-five (85) cases in which immigrant visas have been issued.

Whether individuals whose applications have been **denied** have standing to litigate this case presents a slightly more difficult question.  Although Ms. Dybdahl avers that certain individuals in the List have been "refused" immigrant visas, (*see* Dybdahl Certification Decl. ¶¶ 5-6, 10-11), regulations promulgated under the INA permit applicants to present additional evidence in an effort to overcome a refusal, *see* 22 C.F.R. § 42.81(b)-(c).  Notwithstanding this provision, individuals who have been refused visas lack standing to challenge the denial of their visa applications, and the Court therefore **DISMISSES** from this action petitioners and beneficiaries associated with the eighty-four (84) cases in which visas have been refused.

---

Certification Decl. ¶ 8.)

[4]  In the Supplemental Declaration, Ms. Dybdahl avers that on July 6, 2017, Mr. Karim Al Ammari was scheduled for an immigrant visa application interview on July 9, 2017.  (Suppl. Dybdahl Certification Decl. ¶ 11.)  On July 9, 2017, Mr. Karim Al Ammari appeared for said interview where the consular officer found him to be ineligible for a visa and **refused** his visa application.  (Suppl. Dybdahl Certification Decl. ¶ 11.)

MINUTES FORM 11
CIVIL GEN                          Page 28 of  49                    Initials of Preparer _____

__ : __

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   CV 17-00786 SJO (GJSx)          DATE: <u>August 21, 2017</u>

Finally, the Court considers three other arguments raised by the parties:  (1) those relating to the "doctrine of consular nonreviewability;" (2) those concerning the purported lack of standing based on a delay in visa decision-making; and (3) the exception to the doctrine of mootness where challenged conduct that has ceased is "capable of repetition, yet evading review."  (*See* Certification Opp'n 12; Certification Reply 9.)  These arguments are considered below.

First, notwithstanding their claim that petitioners and beneficiaries associated with fifty-one case numbers have had their immigrant visa applications denied for reasons separate and apart from EO-1 and EO-2, Defendants argue that "the doctrine of consular nonreviewability has long provided that an alien abroad cannot obtain judicial review of the denial of the visa." (Certification Opp'n 12 [citations omitted].)  They then argue that although "[t]he Ninth Circuit has recognized a 'limited exception' to that doctrine 'where the denial of a visa implicates the constitutional rights of American citizens' . . . . Plaintiffs' claims fall outside that limited exception and are therefore foreclosed by the doctrine of nonreviewability." (Certification Opp'n 12 [quoting *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016)].)

Defendants' argument—and the cases on which they rely—rest on the premise that Plaintiffs seek to challenge elements of a **final decision** with which they disagree.  *See Brownell v. Tom We Shung*, 352 U.S. 180, 184 n.3, 185 n.6 (1956); *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792, 794-95 (1977)).  Plaintiffs are not challenging the substance of any decision made by the Government, but instead are challenging Defendants' failure to render any decision at all.  *See Nine Iraqi Allies*, 168 F. Supp. 3d at 288. Indeed, it appears that at least some of Plaintiffs' applications remain pending such that there has not been a final decision with respect to these applications.  The weight of authority here is against Defendants.  *See Patel v. Reno*, 134 F.3d 929, 931-32 (9th Cir. 1997) ("Normally a consular official's discretionary decision to grant or deny a visa petition is not subject to judicial review.  However, when the suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion, jurisdiction exists."); *Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 421 (S.D.N.Y. 2006) ("[T]he wide latitude given the Executive to grant or deny a visa application . . . does not include the authority to refuse to adjudicate a visa application."); *Raduga USA Corp. v. U.S. Dep't of State*, 440 F. Supp. 2d 1140, 1146 (S.D. Cal. 2005) (following *Patel* and holding that the doctrine of consular nonreviewability is inapplicable where "the consular official has not made any decision in four years to date.  That is the crux of this case.").

Defendants also argue that because it is "well-established that there is no standing based on the purported injury of a delay in visa decision-making . . . Plaintiffs lack standing for this reason as well."  (Certification Opp'n 12.)  Defendants cite to *Kodra v. Secretary, Department of State* for the proposition that a plaintiff does not have standing to challenge the delay of a visa determination.  (Certification Opp'n 12 [citing *Kodra*, 903 F. Supp. 2d 1323, 1327 (M.D. Fla.

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:   CV 17-00786 SJO (GJSx)**          **DATE: August 21, 2017**

2012)].)  In *Kodra*, a decision from the Middle District of Florida, the named plaintiff, a nonresident alien, challenged a consular official's refusal to issue him an immigrant visa.  903 F. Supp. 2d at 1327.  The Government argued that, as a nonresident alien, he lacked a constitutional right to enter the United States, and therefore lacked standing to challenge the consular officer's refusal to issue him an immigrant visa.  *Id.*  In *Kodra*, the Government cited to *Kleindienst v. Mandel*, a landmark decision from the Supreme Court that appears to have established that nonresident aliens seeking to enter the United States have "no constitutional right to entry as a nonimmigrant or otherwise."  *Id.* (quoting *Kleindienst*, 408 U.S. 753, 762 (1972)).

*Kodra* and *Kleindienst* are not necessarily applicable, however, both because (1) Plaintiffs in this case are challenging Defendants' policy of unconstitutionally holding in abeyance the adjudication of applications for immigrant visas, rather than quibbling with individual determinations made by consular officials; and (2) Named Plaintiffs and the class they seek to represent include USCs and LPRs who have submitted immigrant visa applications on behalf of their direct relatives and who have both constitutional and statutory rights that may be implicated by this alleged policy of inaction.  Indeed, here, as in *Nine Iraqi Allies*, both the constitutional guarantee that actions taken by the federal government satisfy the strictures of procedural due process and the APA's imposition of a "nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time,'" 5 U.S.C. § 555(b), are implicated by the allegations in the SAC, 168 F. Supp. 3d at 288 (distinguishing Justice Kennedy's concurrence in *Kerry v. Din*, — U.S. —, 135 S. Ct. 2128, 2141 (2015) in which he writes the Government satisfies any due process duty owed to visa applicants and their citizen relatives when it cites the statutory basis for a visa application's denial by noting that "Plaintiffs do not contend that they were entitled to a more fulsome explanation of the Government's decision on each of their SIV applications—they merely claim that they are entitled to a decision"); *id.* at 293-94 (noting Section 706(1) of the APA authorizes judicial review to compel agency action unlawfully withheld or unreasonably delayed).[5]

That is not to say, however, that this case is identical to *Nine Iraqi Allies*.  First, as noted above, Plaintiffs have offered strikingly little evidence regarding the case histories of Named Plaintiffs and

---

[5]  The Court notes that Procedural Due Process claims "hinge[ ] on proof of two elements: (1) a protect[ed] liberty or property interest . . . and (2) a denial of adequate procedural protections."  *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1988).  Indeed, "[t]o have a protected interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  Whether U.S. citizen and LPR petitioners have viable procedural due process claims based on a theory that EO-1 and EO-2 deprived them of a protected "liberty" interest in the visa applications of their alien relatives remains to be seen in the wake of *Kerry v. Din*.  *See Trump v. IRAP*, 137 S. Ct. 2080.

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

the other five hundred plus individuals identified in the List.  This stands in stark contrast to the "significant body of evidence" put forth by the plaintiffs in *Nine Iraqi Allies*.  168 F. Supp. 3d at 283, 287 (noting "the abundance of other evidence Plaintiffs provide" regarding the nature of "administrative processing" and the "convincing evidence Plaintiffs cite to show that Defendants have not finally adjudicated their SIV applications").  Second, the statutes and regulations at issue in *Nine Iraqi Allies* require the government to "process SIV applications within nine months," setting a firm deadline by which agency action was required under the APA.  *Id.* at 293.  Here, by contrast, no statute or regulation imposes a strict timeline for issuing or refusing a visa. Nevertheless, courts in the Ninth Circuit have held that a plaintiff has standing under the APA "to compel the consul to make a decision on their visa applications, which the consul is required to make in the first place pursuant to 22 C.F.R. § 42.81(a)."  *Raduga*, 440 F. Supp. 2d at 1145-46 (citing *Patel*, 134 F.3d at 932).  The Court is persuaded by the reasoning in *Raduga* and concludes that petitioner Plaintiffs who have filed Form I-130 Petitions on behalf of their familial beneficiaries that have been "approved" have rights under the APA to ensure that visa applications premised on the approval of such petitions are handled and acted on in accordance with the INA.

Finally, the Court finds occasion to consider the exception to mootness under which the challenged conduct that has ceased, but is "capable of repetition, yet evading review." *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000).  In *County of Riverside v. McLaughlin*, the United States Supreme Court ruled that class certification may be appropriate in instances in which the putative class representatives' claims have become moot where their claims are "so inherently transitory that the trial court will not have enough time to rule on a motion for class certification before the proposed representative's individual interest expires."  500 U.S. 44, 52 (1991) (internal citation omitted).  In such a case, "mooting a putative class representative's claims will not necessarily moot the class action," even if "the district court has not yet addressed the class certification issue."  *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011).

On the other hand, where a defendant "purposely and strategically" acts to moot plaintiffs' claims as they are added as named plaintiffs in order to insulate the challenged actions from meaningful judicial review, courts will not turn a blind eye.  *Cf.* Order Granting in Part & Den. in Part Mot. to Dismiss & Granting Mot. for Class Cert. ("*Wagafe* Order"), *Wagafe v. Trump*, No. C17-0094-RAJ, *29-*30 (W.D. Wash. June 21, 2017), ECF No. 69.  Indeed, in *Wagafe*, the district court certified a class of aliens seeking admission under the Controlled Application Review and Resolution Program ("CARRP"), notwithstanding that the defendants had adjudicated the applications of each of the named plaintiffs "almost immediately **after** joining this lawsuit."  The court began by noting that, to the extent "this was merely CARRP and the application running its due course and that Plaintiffs' ultimate adjudications happened to coincide with being added as named Plaintiffs—even after their applications lay stagnant for up to four years—class certification would

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>           **DATE:** <u>August 21, 2017</u>

still be appropriate" under the "capable of repetition, yet evading review" exception to mootness. *Id.* at *28-*29.  The court went on to consider another possibility:

> On the other hand, if adjudication of Plaintiffs' applications is not happenstance, and Defendants are purposely and strategically adjudicating Plaintiffs' applications as they are added as named Plaintiffs, such a blatant attempt to moot Plaintiffs' claims will not gain purchase with this Court.  If this is true, Defendants appear to be engaging in a strategy of picking off named Plaintiffs to insulate CARRP from meaningful judicial review.
>
> Such a strategy is apparently not without precedent.  In *Muhanna v. USCIS*, No. 14-cv-05995 (C.D. Cal. July 31, 2014), five individual plaintiffs filed suit challenging CARRP.  After waiting years for adjudication, all five plaintiffs' applications were adjudicated within months of filing suit, and the lawsuit was voluntarily dismissed as moot.  *Id.*, Dkt. No. 51 (entered Dec. 23, 2014).  Similarly, in *Arapi v. USCIS*, No. 16-cv-00692 (E.D. Mo. 2016), 20 individuals filed suit regarding CARRP and their pending naturalization applications.  Soon after, USCIS adjudicated all 20 applications, at which point 19 plaintiffs voluntarily dismissed their claims and USCIS moved to dismiss the final plaintiff's claim as moot.  *Id.*, Dkt. No. 22 (filed Dec. 19, 2016).

*Id.* at *29.  Moreover, the court noted that the mooting of the named plaintiffs' supported a finding that they were adequate representatives.  *Id.* at *29-*30; *see also Ellsworth v. U.S. Bank, N.A.*, 30 F. Supp. 3d 886, 909 (N.D. Cal. 2014) (defendant's "calculated strategy that includes picking off named Plaintiffs" did not moot class action claims); *Ramirez v. Trans Union, LLC*, 2013 WL 3752591, at *2 (N.D. Cal. July 17, 2013) (class certification appropriate where plaintiff's claims would "evade review" if the defendant were able to "pick off" each subsequent lead plaintiff).

In light of the paucity of evidence introduced to date, the Court makes no finding either that Plaintiffs' claims are "capable of repetition, yet evading review" or that Defendants have engaged in a campaign of adjudicating named Plaintiffs' visa applications after such individuals have been added to the litigation in an effort to avoid meaningful judicial review.

        2.    <u>Ripeness</u>

Defendants next argue that four other Named Plaintiffs and certain putative class members are pursuing claims that are not "ripe" because they have not taken the necessary steps to execute an immigrant visa application.  (Certification Opp'n 11-12.)  In particular, Defendants point to evidence indicating the Department of State is not in receipt of an approved Form I-130 Petition filed by Hamid on behalf of beneficiary H.M.  (Dybdahl Certification Decl. ¶ 9.)  They have also

**CIVIL MINUTES - GENERAL**

| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

introduced evidence that Karim Al Ammari, who was assigned case number SAA1995707012, appeared for his immigrant visa application interview on July 9, 2017, where "[t]he consular officer [found] Mr. Karim Al Ammari ineligible for a visa and refuse[d] the visa application." (Suppl. Dybdahl Certification Decl. ¶ 11.) Finally, they point to evidence indicating that certain individuals on the List do not have ripe claims because (1) in sixty-six (66) cases, the petitioner, beneficiary, or both has failed to take the necessary steps to execute a visa application; (2) in twenty-four (24) cases, the Department of State does not have available visa numbers; (3) in fourteen (14) cases, the beneficiary did not appear for his or her visa application interview; and (4) in two cases, the beneficiary is scheduled for a visa application interview. (Suppl. Dybdahl Certification Decl. ¶ 7.)

Plaintiffs do not meaningfully respond to Defendants' ripeness arguments, nor do they provide evidence challenging any of Defendants' claims or relevant portions of Ms. Dybdahl's declarations. (*See generally* Certification Reply.) This presents a significant problem for Plaintiffs, because "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (internal quotation marks omitted)). "That is so because, if the contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009) (citing *Lujan*, 504 U.S. at 560). "In this way, ripeness and standing are intertwined." *Id.*

The fact that an alien's relative has submitted a Form I-130 Petition that was approved does not entitle the alien to immigrate to the United States. Far from it. Instead, an approved Form I-130 Petition is a prerequisite to the alien initiating an immigrant visa application that may, at some point, after all statutory and regulatory hurdles are cleared, mature into an issued immigrant visa. *See generally* Section II(B), *supra*. The hurdles are myriad, and many involve the discretion of the consul. *See id.* Where an applicant has not completed the steps required to be entitled to an immigrant visa under the INA and the regulations promulgated thereunder, any claims she might raise based on delays in the processing of her application are not ripe for adjudication.

          3.    <u>Establishment Clause Claims</u>

In their Dismissal Motion, Defendants argue Plaintiffs have not demonstrated they have standing to assert claims under the Establishment Clause of the First Amendment to the United States Constitution. (*See* Dismissal Mot. 18-20.) Notwithstanding Plaintiffs' failure to respond to this argument, (*see generally* Dismissal Opp'n), the Court gives pause and **RESERVES RULING** on whether Plaintiffs have standing to pursue such a claim until after the United States Supreme Court issues an opinion in the consolidated actions *Trump v. IRAP* and *Trump v. Hawai'i*, Nos. 16-1436 (16A1190) and 16-1540 (16A1191). The Court **STAYS** any and all discovery efforts relating to this cause of action until after our high court issues its opinion. The parties are

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:** CV 17-00786 SJO (GJSx)          **DATE:** <u>August 21, 2017</u>

**ORDERED** to file a joint status report ten (10) days after the Supreme Court issues an opinion in these cases that both summarizes the holding(s) of the opinion and addresses the parties' views concerning how the opinion impacts any of Plaintiffs' asserted causes of action and future discovery efforts.

C.    <u>Class Certification</u>

In their Certification Motion, Plaintiffs argue that each of the four factors listed in Rule 23(a) and three of the factors listed in Rule 23(b) are present. (*See generally* Certification Mot.) Defendants contend that none of the requirements of Rule 23, with the exception of "numerosity," are present, and also submit that the proposed class is not adequately defined. (*See generally* Certification Opp'n.) The Court responds to Defendants' challenges in reverse order.

1.    <u>The Proposed Class Definition</u>

In their opposition, Defendants argue that because Plaintiffs failed to proffer a proposed class definition in any of their pleadings and because the proposed definition they provide in their Certification Motion is "overbroad" and "inadequately defined," the proposed class cannot be certified. (*See* Certification Opp'n 24-26.) Plaintiffs counter that "class membership is based on objective criteria—whether or not individuals have already had I-130 Petitions approved and are currently awaiting final visa application processing while in exile in Djibouti away from the Yemeni civil war." (Certification Reply 16.) Aspects of both sides' arguments are well taken, while others are not.

To begin, this Court has authority to later certify a class that has not been adequately defined in an operative pleading. Plaintiffs in each of their three pleadings have referenced their intention to move for class certification, and the Court will not preclude them another opportunity to do so.

Second, although the Ninth Circuit "does not have its own definition" of "ascertainability," it has "addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues," including overbreadth and vagueness. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 nn. 3, 4 (9th Cir. 2017). The Court agrees with Defendants that the proposed class, as currently defined, is simultaneously "overbroad" and "vague." In particular, the phrase "currently in Djibouti in reliance on the government to complete the final steps" is not "sufficiently definite to conform to Rule 23" because it is far from clear what the "final steps" entail. *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986). Neither the INA nor the regulations promulgated thereunder use the term "final steps," and a proper class definition would reference the **precise steps the applicant completed**—for example, completed an in-person interview, undergone a medical examination, submitted all documents required, etc. It would also require that these steps were completed in a manner consistent with the INA and the regulations

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

promulgated thereunder and to the satisfaction of the consular official(s), who are authorized to exercise their discretion regarding most of the required steps. *See generally* Section II(B), *supra*. A proper class definition would also include either the legally **required steps the government failed to undertake** or the **improper steps that the government undertook**.

There are other problems plaguing Plaintiffs' proposed class definition. First, although Plaintiffs claim that EO-1 and EO-2 were created in an effort to "stymy Muslim immigration into the United States in clear violation to the Establishment Clause and the Administrative Procedures Act," the proposed class definition neither references the religion of the proposed class members (petitioners or beneficiaries) nor requires that those seeking to immigrate to the United States be Yemeni nationals. (Certification Reply 7.) Moreover, as Defendants' correctly point out, the proposed class definition fails to take into account the various timelines implicated by the allegations in the SAC. For example, Plaintiffs allege that "[s]ome Plaintiff 2s applications have been pending, without adjudication, for **over fifteen years**," attributing the "extreme wait times and delays in adjudication of many of Plaintiffs' Petitions . . . to a variety of factors." (SAC ¶ 93 [emphasis added].) According to Plaintiffs, these "factors" include: (1) corrupt and abusive individuals working in the United States Embassy in Sana'a, Yemen "refusing to issue visas in legitimate cases, causing delays and conjuring false, bad faith reasons to render applicants inadmissible;" (2) other corrupt officials "accepting bribes and selling visas, while refusing to issue those legitimate visas in cases in which affected individuals did not have the financial means to pay bribes, or refused to pay bribes;" (3) the closing of the Embassy's doors in the wake of this corruption "and the hostilities currently raging in the Yemeni civil war;" (4) Yemenis trying to escape the war in their home country by traveling to countries abroad, such as Djibouti, Algeria, Egypt, and Malaysia to pursue immigrant visas. (SAC ¶ 93.) Plaintiffs do not tie these allegations regarding events occurring prior to President Trump taking office and signing the two executive orders to any sort of religious animus. Moreover, although it is possible that individuals whose visa applications have been delayed by one or more of these "factors" had their applications **further** delayed in the wake of EO-1 and EO-2, the purported religious animus underpinning these executive orders has allegedly resulted in constitutional injuries that are wholly distinct from those that allegedly have occurred because of corruption within the Yemeni embassy and the atrocities of the Yemeni civil war.

For all of these reasons, the Court concludes that the proposed class cannot be certified. Should Plaintiffs opt to renew their motion for class certification, they must carefully and precisely define the class to eliminate overbreadth and vagueness frailties.

///
///
///
///

| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

**CASE NO.:**   <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

2. <u>Rule 23(a) Prerequisites</u>

The Court next considers the four factors set forth in Rule 23(a): numerosity, commonality, typicality, and adequacy.

a. <u>Numerosity</u>

For a class to be certifiable under Rule 23, it must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." *Vasquez*, 266 F.R.D. at 486 (citing *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y.1998)). Plaintiffs must also establish impracticability of joinder. In determining whether joinder would be impracticable, courts should consider "not only the class size but other factors as well, including the geographic diversity of class members, the ability of individual members to institute separate suits, and the nature of the underlying action and the relief sought." *Nat'l Ass'n of Radiation Survivors v. Walters*, 111 F.R.D. 595, 599 (N.D. Cal. 1986). The limited size of any individual plaintiff's recovery is also relevant. *See Edmondson v. Simon*, 86 F.R.D. 375, 379 (N.D. Ill. 1980).

Plaintiffs argue the proposed class consists of at least **564** individuals. (Certification Mot. 9-11; *see also* Certification Reply 3.) In support, Plaintiffs refer to paragraph 5 of the Goldberg Certification Declaration and Exhibits A and F attached thereto. (Certification Mot. 10-11.) Contrary to Plaintiffs' say-so, however, the cited evidence is woefully inadequate and fails to support their claim that the 564 identified individuals are either petitioners or beneficiaries to Form I-130 Petitions that were "approved" but to whom visas were not "issued." Exhibit A contains the "List," which merely identifies certain "petitioners" and associated "beneficiaries" with one or more "case numbers." (*See* Goldberg Certification Decl., Ex. A.) Plaintiffs have provided no evidence regarding (1) whether any Form I-130 Petitions associated with these case numbers were "approved;" (2) whether the beneficiaries of such petitions completed all steps required to be issued a visa; or (3) whether the consul issued or refused visas to such beneficiaries. Exhibit F, by contrast, "is a list of the stories that [Ms. Goldberg] obtained from many of the [Yemeni] individuals whom [she] met" during her time working on immigration cases in Djibouti. (*Cf.* Goldberg Certification Decl. ¶ 11.) Few if any of these vignettes include the name of the family member who purportedly filed a Form I-130 Petition on behalf of each listed Yemeni applicant. (Goldberg Certification Decl., Ex. F.) **None** indicate whether the Yemeni's visa applications were "approved," "issued," or placed in "administrative processing." (Goldberg Certification Decl., Ex. F.)

Defendants, in addition to pointing out these flaws, have introduced unrebutted evidence that more than a hundred of these 564 individuals do not fall within Plaintiffs' proposed class definition because (1) the alien relatives have been issued immigrant visas; (2) the alien relatives' visa

---

MINUTES FORM 11
CIVIL GEN                                              Initials of Preparer _____

__ : __

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  __CV 17-00786 SJO (GJSx)__          DATE: __August 21, 2017__

application has been refused; (3) the petitioner U.S. citizens or LPRs or their beneficiary aliens have failed to take the necessary steps to have the beneficiary be eligible for an immigrant visa; or (4) the List contains duplicate entries or includes case numbers that simply do not exist.  (*See* Certification Opp'n 10-12; *see generally* Dybdahl Certification Decl.)[6]  Notwithstanding these issues, Defendants do not argue in their brief that the proposed class is insufficiently numerous to be entitled to class treatment.  (*See generally* Certification Opp'n.)  Should Plaintiffs renew their motion for class certification at a later date, they will be required to carefully document that status of each putative class members' visa application, including (1) the steps they have taken to be eligible for a visa; (2) whether they are currently scheduled for an interview or whether and when their interviews have been cancelled; (3) whether their application is currently in "administrative processing;" (4) when the application entered this stage and for how long it has been in this stage; and (5) other information necessary for the Court to meaningfully categorize the putative class members.

b.   Commonality

Rule 23(a) also demands "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, plaintiffs' "claims must depend upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, —, 131 S. Ct. 2541, 2551 (2011).  "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a **single significant question of law or fact**." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013), *cert. denied*, — U.S. —, 135 S. Ct. 53 (2014) (emphasis altered) (internal quotation marks omitted).  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

In their Certification Motion, Plaintiffs submit that the following ten (10) common factual and/or legal questions are applicable to **all** putative class members:

---

[6]   Plaintiffs, for their part, argue in their Reply that "[w]ell over five hundred known individuals are within Plaintiff's [sic] proposed class definition."  (Certification Reply 3.) They offer no evidence to support this assertion, which is particularly troubling given the evidence put forth by Defendants regarding hundreds of putative class members who have been issued immigrant visas, have had their applications refused for reasons wholly unrelated to EO-1 and EO-2, or simply never took the necessary steps to be entitled to an IV.  *See* Section III(A)(1), *supra*.

MINUTES FORM 11
CIVIL GEN                    Page 37 of 49                    Initials of Preparer _____

___ : ___

| | | |
|---|---|---|
| Priority | | _____ |
| Send | | _____ |
| Enter | | _____ |
| Closed | | _____ |
| JS-5/JS-6 | | _____ |
| Scan Only | | _____ |

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **CV 17-00786 SJO (GJSx)**        **DATE:** **August 21, 2017**

1. Whether Defendants in fact cancelled Plaintiff 2s' immigrant visa application interviews;

2. Whether enforcement of the EO caused excessive delays in the processing of named Plaintiff 2s' [immigrant visas];

3. Whether, as a policy, procedure or practice, Defendants (and Defendant Department of State in particular) are refusing to schedule or reschedule named Plaintiff 2s' immigrant visa application interviews;

4. Whether improprieties in the procedures governing [immigrant visa application] processing preexisted the EO, and whether such improprieties continue to adversely impact Plaintiffs;

5. Whether, as a policy, procedure or practice, Defendants (and Defendant Department of State in particular) have failed to adhere to the relevant provisions of the Foreign Affairs Manual in their cancellation of certain Plaintiff 2s' immigrant visas;

6. Whether Defendants' (and Defendant Department of State in particular) failure to adhere to the provisions of the Foreign Affairs Manual constitutes a violation of the Administrative Procedures Act;

7. Whether Defendants' conduct vis-à-vis Plaintiffs 2s is discriminatory under Section 1152 of the Immigration and Reform Act;

8. Whether enforcement of the EO resulted in a violation of Plaintiff 1s' procedural and/or due process rights under the Fifth Amendment;

9. Whether enforcement of the EO resulted in a violation of Plaintiff 1s' rights under the Equal Protection Clause; and

10. Whether the EO runs afoul of the Establishment Clause of the First Amendment.

(*See* Certification Mot. 12.) Defendants take issue with these questions, arguing they "reveal that the named and Doe Plaintiffs, much less the proposed class members, do not have a single common question applicable to them, and have not suffered the same injury, as the commonality criterion requires."  (Certification Opp'n 18.)

Common factual and legal questions potentially exist, at least with respect to those putative class members who have had their Form I-130 Petitions approved **and have taken all necessary steps** to become eligible for an immigrant visa, but have allegedly been stymied by Defendants' "purposeful and unlawful discriminatory delays." (*See* Certification Reply 6.)  Such individuals have claims that "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution . . . in one stroke."  *Dukes*, 564 U.S. at 350.  Indeed, here, as in *Dukes*, Plaintiffs allege that Defendants "engage[ ] in a pattern or practice" of violating the law."  *Id.* at 352; (*see also* Certification Mot. 12 [describing the "policy, procedure or practice" of Defendants]).  But unlike in *Dukes*, in which the Supreme Court found certification to be an inappropriate tool to

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

resolve aggrieved female employees' individualized employment-related disputes, Plaintiffs in this case allege that there is "glue holding the alleged reasons for all those [500 plus] decisions" not to act on their otherwise approvable visa applications. *Cf. Dukes*, 564 U.S. at 352.

That said, both the allegations in the SAC and the evidence introduced by Defendants establishes that not all putative class members have been affected in the same way. For example, in their SAC, Plaintiffs allege that "[s]ome Plaintiff 2s applications have been pending, without adjudication, for over fifteen years," attributing the "extreme wait times and delays in adjudication of many of Plaintiffs' Petitions . . . to a variety of factors." (SAC ¶ 93.) According to Plaintiffs, these "factors" include: (1) corrupt and abusive individuals working in the United States Embassy in Sana'a, Yemen " refusing to issue visas in legitimate cases, causing delays and conjuring false, bad faith reasons to render applicants inadmissible;" (2) other corrupt officials "accepting bribes and selling visas, while refusing to issue those legitimate visas in cases in which affected individuals did not have the financial means to pay bribes, or refused to pay bribes;" (3) the closing of the Embassy's doors in the wake of this corruption "and the hostilities currently raging in the Yemeni civil war;" (4) Yemenis trying to escape the war in their home country by traveling to countries abroad, such as Djibouti, Algeria, Egypt, and Malaysia to pursue immigrant visas. (SAC ¶ 93.) But the "chaos that the EO1 generated has exacerbated Plaintiffs' hardships and created further confusion and delay in the [immigrant visa] petitioning process," while the "unlawful prohibition on travel for Yemeni citizens to the United States, which are contained in the EO1, EO2, and internal . . . diplomatic cables, have also substantially contributed to Plaintiffs' hardships and created delays and other improprieties in the visa application process." (SAC ¶¶ 94-95.) According to the SAC, the "alleged reasons" underlying putative class members' claims are myriad such that it is far from clear that "common answers" to the critical question of why a particular visa application was not swiftly adjudicated exist.

This point is underscored by the evidence submitted by Defendants. Ms. Dybdahl avers that although some Named Plaintiffs and putative class members referenced in the List have been issued immigrant visas, others have been refused immigrant visas, while still others have not taken the necessary steps to execute an immigrant visa application. (Dybdahl Certification Decl. ¶¶ 10-12; Suppl. Dybdahl Certification Decl. ¶ 7.) She further declares that, for those putative class members whose visa applications are still pending, the applications are at different stages in the approval process, and identifies several stages that exist prior to "final processing." (*See* Dybdahl Certification Decl. ¶ 10.) For example, Ms. Dybdahl swears that immigrant visa petitions were "approved" in **twenty-four (24) cases** in which priority dates are not current, such that "visa numbers are not currently available" for these cases. (Suppl. Dybdahl Certification Decl. ¶ 7.) She next avers that **sixty-six (66) cases** involve instances in which the priority date is current and visa numbers are available, but the petitioner, the beneficiary, or both either have not completed necessary "preprocessing steps" at the National Visa Center ("NVC") or otherwise have failed to pursue a visa application. (Suppl. Dybdahl Certification Decl. ¶ 7.) She then

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  **CV 17-00786 SJO (GJSx)**          DATE: **August 21, 2017**

declares that **fourteen (14) cases** involve instances in which visa numbers are available, preprocessing steps were completed, and visa application interviews were scheduled, but where the beneficiary failed to appear for his or her interview. (Suppl. Dybdahl Certification Decl. ¶ 7.) Next, she swears that in **two cases**, petitioners are currently scheduled for future visa application interviews. (Suppl. Dybdahl Certification Decl. ¶ 7.) Finally, she avers that **one case** does not involve an immigrant visa application at all, but instead involves a nonimmigrant visa application under Section 101(a)(15)(K) of the INA. (Dybdahl Certification Decl. ¶ 10.)

In short, although commonality is theoretically present among those putative class members who fall within the proposed class definition, the Court is unable to determine from the record which, if any, Named Plaintiffs or individuals identified in the List fall within that definition. This shortcoming underscores the need for additional information in any future motion for class certification, as discussed in Sections II(C)(2)(a)-(b), *supra*.

       c.   <u>Typicality</u>

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (internal quotation marks omitted) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (internal quotation marks omitted) (quoting *Hanon*, 976 F.2d at 508). The typicality standard under Rule 23(a)(3) is "permissive": "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (quoting *Hanlon*, 150 F.3d at 1020).

Plaintiffs argue the claims of Named Plaintiffs are typical of those of the putative class members because they all "have been subject to (1) delays in family reunification; (2) economic hardship, and (3) emotion and psychological suffering at the hands of Defendants' based on [their] enforcement of the EO and general failure to adhere to proper visa-processing procedures despite the fact that all Plaintiff 2s have had their I-130 Petitions approved." (Certification Mot. 13.) In their reply brief, they clarify their position that "[l]ike each proposed class member, Plaintiffs are the United States Citizen or [LPR] Petitioners and the Immediate Relative Beneficiaries of documentary complete *Immigrant Visa Applications* awaiting adjudication at the U.S. Embassy in Djibouti." (Certification Reply 7.) "In addition, [Defendants] ha[ve] subjected Yemeni *Immigrant Visa Applications* to unlawful and purposefully discriminatory delay in adjudication on account of the Beneficiary's religious beliefs." (Certification Reply 7.)

| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:** __CV 17-00786 SJO (GJSx)__          **DATE:** __August 21, 2017__

In *Rodriguez v. Hayes*, the Court of Appeals for the Ninth Circuit examined whether typicality existed in a case in which an individual petitioner detained by the government pending the outcome of his removal proceedings who was seeking a bond hearing and who was seeking to represent a class of other detainees, notwithstanding that he "and some of the other members of the proposed class are detained under different statutes and are at different points in the removal process and hence do not raise identical claims[.]" 591 F.3d 1105, 1124 (9th Cir. 2010). In answering this question in the affirmative, the court of appeals noted that each putative class member nevertheless "raise[s] similar constitutionally-based arguments and all are alleged victims of the same practice of prolonged detention while in immigration proceedings." *Id.* (citing *Armstrong*, 275 F.3d at 869 for its holding that typicality existed where class representatives suffered with the rest of the class "a refusal or failure to afford them accommodations as required by statute, and [were] objects of discriminatory treatment on account of their disabilities" in parole and parole revocation proceedings).

Although Plaintiffs allege that each member of the proposed class has been harmed in the same manner by the President's signing of EO-1 and EO-2 and by events that occurred thereafter, the evidence that has been introduced to date does not bear this out. For example, Exhibits D and E to the Goldberg Certification Declaration provide some evidence that the U.S. Embassy in Sana'a, Yemen confiscated passports from certain American citizens in Yemen, citing concerns regarding "fraud" in the process. (*See* Goldberg Certification Decl., Exs. D, E.) But Plaintiffs' allegations concerning EO-1 and EO-2 center on a theory that Defendants, at the behest of President Trump and Secretary of State Tillerson, placed immigrant visa applicants in "administrative processing" in order to indefinitely delay adjudicating their applications. Thus, the claims that some putative class members are raising concerning events that predate EO-1 are not "reasonably coextensive" with the claims of other putative class members who claim they have been adversely impacted by the signing of the two executive orders. Moreover, as stated in Sections II(B)(1)-(2) and II(C)(2)(a)-(b), *supra*, Defendants have introduced unrebutted evidence that one Named Plaintiff (Eraga) has already been issued an immigrant visa; that another (Alammari) has been denied an immigrant visa; and that the Department of State is not in receipt of an approved Form I-130 Petition filed on behalf of a third Named Plaintiff (H.M.).

Accordingly, although the constitutional and statutory harms that Named Plaintiffs claim have befallen them are "reasonably coextensive" with the harms allegedly faced by members of the proposed class insofar as each alleges the government has stonewalled their visa applications, Plaintiffs have not introduced evidence that Named Plaintiffs have in fact been harmed in such a manner. In a renewed motion for class certification, Plaintiffs must take care to address these issues by way of additional argument and, more importantly, by introducing corroborating evidence.

///

MINUTES FORM 11
CIVIL GEN                                    Page 41 of 49          __ : __
                                                          Initials of Preparer _____

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** **CV 17-00786 SJO (GJSx)**        **DATE: August 21, 2017**

              d.    <u>Adequacy</u>

The final requirement in Rule 23(a) is that of "adequacy." "Whether the class representatives satisfy the adequacy requirement depends on 'the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.'" *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) (quoting *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1994)).

Named Plaintiffs submit they "will fairly and adequately protect the interests of the respective classes because they seek the same relief and bring this action on behalf of the class." (Certification Mot. 8.)   Defendants argue that "[a]s applied to this case, Plaintiffs fail to demonstrate how adjudication of the claims of any of the Named Plaintiffs will fairly and adequately protect the diverse interests of the proposed class." (Certification Opp'n 23.) They also claim that because Named Plaintiffs "lack standing" and seek to assert "unripe" claims, they "are in no position to sustain their own claims and thus cannot prosecute the action vigorously on behalf of the class." (Certification Opp'n 23.) In their reply brief, Plaintiffs do not directly respond to Defendants' challenges regarding standing and ripeness, but otherwise submit that Named Plaintiffs and their law firm would adequately represent the interests of absent class members. (*See* Certification Opp'n 15.)

Defendants are correct that, where injunctive and declaratory relief are the sole forms of relief sought by a putative class, individuals who lack standing to seek injunctive relief do not "share an interest with class members whose primary goal is to obtain injunctive relief" and therefore "will not adequately protect the interests of the class as a whole." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011).  The sole evidence that has been introduced indicates that each of the six Named Plaintiffs either have claims that are moot or are pursuing claims that are not yet ripe.  *See* Section III(A), *infra*.  Should Plaintiffs choose to renew their motion, they must ensure that the proposed class representatives have standing to pursue claims that are ripe—i.e., although they have completed all steps required of them under the INA and the implementing regulations, their visa applications have not yet been finally adjudicated.

           3.    <u>Certification Under Rule 23(b)</u>

The Court next examines whether certification under any of Rules 23(b)(2), (b)(1)(A), or (b)(1)(B) would be appropriate in this case.

              a.    <u>Rule 23(b)(2)</u>

"Rule 23(b)(2) provides that a class action is appropriate if 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final

**Priority** ____
**Send** ____
**Enter** ____
**Closed** ____
**JS-5/JS-6** ____
**Scan Only** ____

### CIVIL MINUTES - GENERAL

**CASE NO.:**  <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

injunctive relief or corresponding declaratory relief with respect to the class as a whole.'" *Zinser*, 253 F.3d at 1195 (quoting Fed. R. Civ. P. 23(b)(2)).  "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Id.* (citations omitted).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 361.

Plaintiffs contend that certification under Rule 23(b)(2) is appropriate because they "are asking the Court to declare discriminatory and purposeful delays at the U.S. Embassy in Djibouti unlawful and enjoin the Government from further delays," such that "all members of the proposed class" would benefit "in identical fashion."  (Certification Reply 9; *see also* Certification Mot. 16-18.)  Indeed, Plaintiffs claim that their "evidence—at least preliminarily—demonstrates that, as a matter of policy or practice, Defendants have failed to adhere to the relevant statutory procedures, such as the Foreign Affairs Manual, in processing IVs."  (Certification Mot. 17 [citing Goldberg Certification Decl. ¶¶ 13-15, Exs. H-I].)

Defendants argue certification under Rule 23(b)(2) would not be proper by reiterating their arguments regarding standing, ripeness, overbreadth and vagueness. (Certification Opp'n 26-27.)  Defendants' concerns are well-founded.  (*See* Sections III(A), (B)(1), *supra*.)  In light of both the evidentiary and definitional problems that have been discussed at length and the obligation that the Court conduct a "'rigorous analysis" to ensure that the Rule 23 requirements are satisfied," *Falcon*, 457 U.S. at 161, the Court finds that certification under Rule 23(b)(2) would not be appropriate at this juncture.

> b.  <u>Rules 23(b)(1)(A) and 23(b)(1)(B)</u>

Finally, Plaintiffs contend that certification under both Rule 23(b)(1)(A) and Rule 23(b)(1)(B) would be appropriate in this case.  (Certification Mot. 18-19.)  Defendants do not respond to these arguments.  (*See generally* Certification Opp'n.)

"A class action is maintainable under Rule 23(b)(1)(A) if 'prosecution of separate actions . . . would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class. . . .'"  *Zinser*, 253 F.3d at 1193 (quoting Fed. R. Civ. P. 23(b)(1)(A)).  "The phrase 'incompatible standards of conduct' refers to the situation where 'different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct.'"  *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1773 at 431 (2d ed.1986) (footnote omitted)).  "This danger exists in those situations in which the defendant by reason of the legal relations involved can not as a

__ : __

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>        **DATE:** <u>August 21, 2017</u>

practical matter pursue two different courses of conduct." *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973) (footnotes omitted).

Certification pursuant to Rule 23(b)(1)(B), by contrast, is justified if adjudications by individual members of the class would "as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." *Zinser*, 253 F.3d at 1196 (quoting Fed. R. Civ. P. 23(b)(1)(B)). "Class actions are permitted under Rule 23(b)(1)(B) if separate actions 'inescapably will alter the substance of the rights of others having similar claims.'" *Id.* at 1196-97 (quoting *McDonnell-Douglas Corp. v. U.S. Dist. Court for Central Dist. of Cal.*, 523 F.2d 1083, 1086 (9th Cir. 1975)).

Although the Court is not persuaded that Rule 23(b)(1)(B) is applicable in this case, Plaintiffs present a somewhat persuasive argument that certification under Rule 23(b)(1)(A) might be appropriate in light of the "core example" cited in the *Newberg on Class Actions* treatise. (*See* Certification Mot. 18.) Going forward, Defendants would be wise to respond to all of the arguments advanced by Plaintiffs.

    D.   <u>Dismissal Motion</u>

A number of issues raised in the Dismissal Motion are addressed in Sections III(B) and (C), *supra*. The issues that remain are (1) whether Plaintiffs' Mandamus Claims should be severed and dismissed; and (2) whether dismissal of Plaintiffs' declaratory relief claims related to EO-1 is warranted in light of its apparent revocation by EO-2. These questions are considered below.

        1.   <u>Severance and Dismissal of the Mandamus Claims</u>

Defendants ask this Court to sever and dismiss Plaintiffs' Mandamus Claims in part under Rule 21 and in part under the doctrine of consular nonreviewability. Defendants argue that Plaintiffs' Mandamus Claims do not arise out of the same transaction or occurrence, do not present common questions of law, and require different presentation of evidence. (*See generally* Dismissal Mot.) They submit that litigating the claims together would not promote judicial economy or settlement. (Dismissal Mot. 7-14.) Alternatively, they argue that Plaintiffs' Mandamus Claims must be dismissed to the extent they challenge not merely the delay of Plaintiffs' applications, but also the denial of any visas. (Dismissal Mot. 14.)

           a.   <u>The Mandamus Claims Do Not Arise Out of the Same Transaction or Occurrence</u>

Defendants assert not only that the claims seeking injunctive and declaratory relief arise from a different transaction or occurrence than the Mandamus Claims, but also that each individual

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:  CV 17-00786 SJO (GJSx)          DATE: August 21, 2017**

plaintiff's mandamus claim "will hinge on a unique combination of transactions and occurrences, based on each plaintiff's factual circumstances, eligibility for an immigrant visa, and his or her individual action or inaction with regard to the visa application process."  (Dismissal Mot. 8.)  In support of these arguments, Defendants contend that while Plaintiffs allege that EO-1 and EO-2 caused **some** delay in the processing of then-pending visa applications, (*see, e.g.*, SAC ¶ 8), Plaintiffs also point to a host of other factors they claim affected the processing of applications, such as the alleged corruption at the Embassy in Sana'a, (SAC ¶¶ 93(a), 93(b), 93(c)), the transfer of visa application interview scheduling from Sana'a to Algiers and then to Djibouti, (SAC ¶¶ 93(d), 93(e), 103), and a backlog waiting for visa application interviews, (SAC ¶¶ 91-93).  (*See* Dismissal Mot. 7.)

In response, Plaintiffs contend their "claims arise out of the same transaction or occurrence where there are allegations of a 'systemic pattern of events' such as a 'pattern or policy of delay in dealing with all applications and/or petitions.'"  (Dismissal Opp'n 6.)  In support, Plaintiffs cite to *Coughlin v. Rogers* for the proposition that where a plaintiff alleges a systemic pattern of events or alleges a pattern or policy of delay, such claims should not be severed.  (Dismissal Opp'n 6 [citing *Coughlin*, 130 F.3d 1348, 1351 (9th Cir. 1997)].)  In *Coughlin*, the Ninth Circuit affirmed the district court's order severing the mandamus claims from the other claims where the court found that plaintiffs did not allege a pattern or policy of delay in dealing with all applications and/or petitions by the INS.  130 F.3d at 1350-51.  In that case, the district court concluded that the mere allegation of delay was not enough to create a common transaction or occurrence.  *Id.* at 1350.  Relevant to the district court's analysis were (1) that each plaintiff was alleged to have waited a different length of time; (2) that the delays were disputed in some cases; and (3) the existence of numerous reasons for the alleged delays.  *Id.*  These factors are all present in this case.  (*See, e.g.*, SAC ¶¶ 92-93 ["Some Plaintiff 2s applications have been pending, without adjudication, for over fifteen years. . . .  The extreme wait times and delays in adjudication of many Plaintiff's Petitions is due to a variety of factors."].)  The Court agrees with the reasoning of *Coughlin* and concludes that Plaintiffs' common allegation of "delay" in the processing of their visa applications does not suffice to create a common transaction or occurrence, particularly given the unique factual background underlying each Mandamus Claim.  This factor weighs in favor of severing the Mandamus Claims from the injunctive and declaratory relief claims.

   b.  The Mandamus Claims Do Not Present Common Questions of Law

Defendants next submit that Plaintiffs' claims do not present common questions of law.  They contend that in order to resolve the injunctive and declaratory relief claims, the Court "must determine whether [EO-1], [EO-2], and the Cables violate the Constitution and the Immigration and Nationality Act ('INA'), and whether Plaintiff's satisfy the requirements for injunctive relief regarding these orders and directives."  (Dismissal Mot. 8.)  In contrast, in order to resolve the Mandamus Claims, Defendants suggest the Court "must determine whether Defendants' action

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 17-00786 SJO (GJSx)</u>          **DATE:** <u>August 21, 2017</u>

with regard to 'Plaintiff 2s Immigrant Visas' violate[s] the APA and the Mandamus Statute." (Dismissal Mot. 8.) These issues, they contend, present unique questions of law and fact. (Dismissal Mot. 8 [citing *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 870 (9th Cir. 2015) (severing claims because they required particularized factual analysis); *Coughlin*, 130 F.3d at 1350-51].)

Plaintiffs respond that all claims in this case present the same common question of law—namely, "whether the Department of State is improperly and unreasonably denying adjudication of Yemeni visa applications." (Dismissal Opp'n 7.) They also argue that the separate Mandamus and injunctive and declaratory relief claims merely address the various **means** by which the Department of State has delayed adjudication. (Dismissal Opp'n 7.) This argument does not persuade, and in any event, does not suggest that severance would be inappropriate. While each Plaintiff is alleged to be either a petitioner or beneficiary to an approved Form I-130 Petition, each of their cases presents a unique factual situation. Furthermore, each Plaintiff's mandamus claim is discrete, and involves different legal issues, standards, and procedures. *See Coughlin*, 130 F.3d at 1351. This is especially the case where Plaintiffs challenge EO-1, EO-2, and the Cables on constitutional grounds, while premising their Mandamus Claims on statutory and regulatory grounds. As such, this factor weighs in favor of severing the Mandamus Claims from the injunctive and declaratory relief claims.

           c.    <u>The Mandamus Claims Require Presentation of Different Evidence</u>

Penultimately, Defendants, relying in part on *Coughlin*, contend that resolving the mandamus claim of each of the approximately 570 individuals named in the List "requires the presentation of evidence unique to each particular petitioner for mandamus, further supporting severance." (Dismissal Mot. 9.) Plaintiffs respond that unlike the claims in *Coughlin*, which involved different types of applications, petitions, or forms, all 570 or so Plaintiffs in this case are either the petitioner or beneficiary of a particular family-based visa petitions; namely, the Form I-130 Petition. (Dismissal Opp'n 8.) Plaintiffs suggest that in light of this common factual predicate, it necessarily follows that there no different evidence is needed to adjudicate the mandamus claims. (Dismissal Opp'n 8.)

Plaintiffs' argument does not hold water. Although the Court agrees that all of their claims arise after each allegedly received an approved Form I-130 Petition, significant steps were required on the part of both the applicant (the beneficiary to the petition), as well as the government, such that each Plaintiffs' mandamus claim presents a different factual situation requiring personalized attention by the Department of State, and ultimately, by the Court. Moreover, Plaintiffs fail to address the fact that the evidence required to obtain injunctive relief and the evidence required to obtain mandamus relief is separate and distinct. (*Cf.* Dismissal Opp'n 8.) The Court concludes that Plaintiffs' individual mandamus claims will require the presentation of different evidence, underscoring the propriety of severance.

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**   CV 17-00786 SJO (GJSx)          **DATE: August 21, 2017**

        d.       <u>Litigating Plaintiffs' Mandamus Claims Together with the Injunctive and Declaratory Relief Claims Would Not Promote Judicial Economy</u>

Finally, Defendants urge the Court to sever Plaintiffs' claims on the basis that "litigating 570 individual mandamus claims would be unwieldy and would not promote judicial economy." (Dismissal Mot. 9.)   Instead, they suggest that proceeding in such a manner would be "unmanageable and result in significant delay, " effectively requiring hundreds of mini-trials. (Dismissal Mot. 9-10 [citing *Padron v. Onewest Bank*, No. 2:14-CV-01340 ODW, 2014 WL 1364901, at *5 (C.D. Cal. Apr. 7, 2014) (severing claims because trying them together would be inefficient and require separate mini-trials); *Trazo v. Nestle USA, Inc.*, No. 5:12-CV-02272-PSG, 2013 WL 12214042, at *3 (N.D. Cal. Dec. 4, 2013) (severing claims because it would streamline discovery and case management)]; *see also* Dismissal Reply 4, ECF No. 96.)   According to Defendants, this is because Plaintiffs' Mandamus Claims arise from their individual applications for visas under their own unique circumstances.   (Dismissal Mot. 10 [citing *White v. Greenpoint Mortg. Funding Inc.*, No. 14-80452-CIV, 2014 WL 11370418, at *1 (S.D. Fla. June 26, 2014), *aff'd sub nom. White v. . Bank of Am. Nat'l Ass'n*, 599 Fed. App'x 379 (11th Cir. 2015) (because the plaintiffs' claims "arise out of Plaintiffs' respective and unrelated, individual mortgage transactions" they constitute "essentially, twenty-four unrelated actions pled in one Complaint" and were therefore "improperly joined")].)

In response, Plaintiffs conclusorily assert that "denying the request for severance will promote judicial economy and allow the parties to work towards settlement of the claims."   (Dismissal Opp'n 9.)   The mere possibility of settlement, however, does not offset the inconvenience caused by the necessity of making hundreds of fact-specific determinations in order to resolve the myriad Plaintiffs' Mandamus Claims.   This factor likewise favors severance.

        e.       <u>Conclusion Regarding Plaintiffs' Mandamus Claims</u>

In sum, the Court finds that the interests of justice are not served by joinder of Plaintiffs' Mandamus Claims with their claims for injunctive and declaratory relief.   Efficiency will not be promoted by permitting more than five hundred Plaintiffs to adjudicate the merits of their pending visa applications, as each case will involve distinct factual and legal issues and must be separately considered by the Court.   Moreover, severing Plaintiffs' Mandamus Claims will not prejudice any substantial right.   Accordingly, the Court **GRANTS** Defendants' motion to sever and dismiss Plaintiffs' Mandamus Claims and **DISMISSES** these claims **without prejudice**.

        2.       <u>Whether Plaintiffs' Declaratory Relief Claims Related to EO-1 Are Moot</u>

Separate and apart from their request to sever Plaintiffs' Mandamus Claims, Defendants also contend that dismissal of Plaintiffs' declaratory relief claims related to EO-1 is warranted because

| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:**   CV 17-00786 SJO (GJSx)          **DATE:** **August 21, 2017**

this executive order was revoked by the terms of EO-2. (Dismissal Order 14.) According to Defendants, because EO-1 has been revoked, any claims related to EO-1 should be dismissed as moot. (Dismissal Order 14.)

Plaintiffs argue that EO-1 "has not yet been revoked and will not be revoked until the Supreme Court has issued a ruling on the injunctions taken under certiorari for the October term." (Dismissal Opp'n 9.) In support, Plaintiffs rely upon the June 14, 2017 Presidential Memorandum for the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence ("Memo"), which "extended the effective date of [EO-2] until the injunctions against it had been lifted." (Dismissal Opp'n 9-10; *see* Dismissal Reply 1, Ex. A ["Memo"].) Defendants offer that the Memo merely declares the effective date of each enjoined provision of EO-2 to be the date on which those injunctions are either lifted or stayed. (*See* Memo.) As such, Defendants submit that Section 1(1) of EO-2, which revokes EO-1, was never enjoined and thus took effect on March 16, 2017, the effective date of EO-2. (Dismissal Reply 1.)

Although the Court agrees that EO-1 has been revoked as of March 16, 2017, this reality does not require that Plaintiffs' declaratory relief claims centering on EO-1 must be dismissed as moot. "The test for mootness applied to a claim for declaratory relief 'is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853 (9th Cir. 2017). Defendants rely on *Bayer* for the proposition that "a declaratory judgment merely adjudicating past violations of federal law—as opposed to continuing or future violations of federal law is not an appropriate exercise of federal jurisdiction." (Dismissal Mot. 15 [quoting *Bayer*, 861 F.3d at 867].) However, the Ninth Circuit in *Bayer* went on to state that in order "to avoid mootness with respect to a claim for declaratory relief on the ground that the relief sought will address an ongoing policy, the plaintiff must show that the policy 'has adversely affected and continues to affect a present interest.'" *Bayer*, 861 F.3d at 868 (quoting *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 125-26 (1974)). Here, Plaintiffs are challenging Defendants' alleged policy of holding in abeyance the adjudication of Plaintiffs' applications for immigrant visas on both constitutional and statutory grounds. They allege that EO-1 impacted "many Plaintiffs' applications" by exacerbating wait times and hardships and by creating further confusion and delay in the immigrant visa application process. (SAC ¶¶ 92, 94.) In light of these allegations, the Court concludes that Plaintiffs' claim for declaratory relief stemming from EO-1 is not moot, and **DENIES** Defendants' Dismissal Motion on this basis.[7]

---

[7] To the extent Defendants rely on *Ali v. Trump*, for the proposition that revocation of EO-1 moots "all claims arising therefrom," (*see* Dismissal Mot. 15), the Court notes that the cited order in that case involves a now-stayed motion for a temporary restraining order and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  **CV 17-00786 SJO (GJSx)**          **DATE:** <u>August 21, 2017</u>

IV.    <u>RULING</u>

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Class Certification.  The Court will permit Plaintiffs to file a renewed motion for class certification not to exceed thirty (30) pages on or before **October 16, 2017**, with a hearing date of **December 11, 2017**, that addresses each of the concerns highlighted in this Order.  Defendants will have twenty-one (21) days to respond by way of an opposition brief not to exceed thirty (30) pages, and Plaintiffs will fourteen (14) days to respond by way of a reply brief not to exceed ten (10) pages.

In addition, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Sever and Dismiss Plaintiffs' Mandamus Claims and to Dismiss the Remaining Claims in Plaintiffs' Second Amended Complaint for Injunctive Relief and Petition For Writ of Mandamus.  Plaintiffs' Mandamus Claims are **SEVERED** from this action and are **DISMISSED without prejudice**.

The Court **STAYS** any and all discovery efforts related to Plaintiffs' Establishment Clause Claim until after the United States Supreme Court issues an opinion in the consolidated cases *Trump v. IRAP* and *Trump v. Hawai'i*.  The Court **ORDERS** the parties to file a joint status report ten (10) days after the Supreme Court issues its opinion in these cases that both summarizes the holding(s) of the opinion and addresses the parties' views concerning how the opinion impacts any of Plaintiffs' asserted causes of action and future discovery efforts.

The Court encourages both sides to carefully review the United States District Court for the District of Columbia's decision in *Nine Iraqi Allies* and the other authorities cited in this Order before filing any additional pleadings in this action.

IT IS SO ORDERED.

---

preliminary injunction, *see* — F. Supp. 3d —, 2017 WL 1057645 (W.D. Wash. Mar. 17, 2017).  Indeed, in *Ali*, the district court concluded based on the facts and claims presented that where a putative class of plaintiffs were seeking to preliminarily enjoin the government from enforcing Section 3 of EO-1 on a class-wide basis, that Plaintiffs' particular motion was moot because EO-2 expressly revoked EO-1.  *Ali*, 2017 WL 1057645 at *3.